**SCHOLASTIC, INC., J.K. Rowling, and Time Warner Entertainment Company, L.P., Plaintiffs/Counterclaim Defendants,**

v.

**Nancy STOUFFER, Defendant/Counterclaim and Crossclaim Plaintiff,**

v.

**ABC Corporations (1 through 99), Crossclaim Defendants.**

**No. 99 Civ. 11480(AGS).**

United States District Court, S.D. New York.

Sept. 17, 2002.

Edward H. Rosenthal, Frankfurt Garbus Kurnit Klein & Selz, P.C., New York City, for Scholastic Inc., J.K. Rowling.

Dale M. Cendali, O'Melveny & Myers LLP, New York City, for Time Warner Entertainment Co., L.P.

Thomas S. McNamara, Indik & McNamara, P.C., Philadelphia, PA, James A. Power, Jr., Power Del Valle, New York City, for Nancy Stouffer.

## *MEMORANDUM ORDER*

SCHWARTZ, District Judge.

This action involves intellectual property rights related to the *Harry Potter* series of books, which were written, published, and marketed by plaintiffs/counterclaim defendants ("plaintiffs"). Plaintiffs Scholastic, Inc. ("Scholastic"), J.K. Rowling ("Rowling"), and Time Warner Entertainment Company, L.P. ("TWE") seek (i) a declaratory judgment that they have not infringed and are not infringing any of defendant/counterclaim plaintiff Nancy Stouffer's ("Stouffer's") copyrights or trade-

marks; and (ii) injunctive relief barring Stouffer from continuing to claim that plaintiffs have violated her copyrights or trademarks. Stouffer asserts counterclaims and crossclaims (referred to herein as "counterclaims") for federal and state trademark infringement, false designation of origin, unfair competition, dilution, and copyright infringement.

Before the Court are plaintiffs' motions for summary judgment pursuant to Fed. R.Civ.P. 56 and for sanctions. For the reasons set forth below, the motions for summary judgment and for sanctions are granted.

## I. Background

Unless otherwise noted, the following facts are undisputed.

### A. *Plaintiffs/Counterclaim Defendants and the* Harry Potter *Series*

Scholastic is a New York corporation with its principal place of business in New York; Rowling is an individual residing in Edinburgh, Scotland; and TWE is a Delaware limited partnership with its principal place of business in New York. (Complaint ¶¶ 2–4). Rowling is the author of the four books in the *Harry Potter* series and is the owner of all copyrights, trademarks, and service marks associated with the series. (*Id.* ¶¶ 12–14; see also Plaintiffs' Statement Pursuant to Local Rule 56.1 ("Pl.56.1") ¶ 1.) Scholastic is the U.S. publisher and distributor of the *Harry Potter* books. (Complaint ¶¶ 11–12). TWE owns the film rights to at least two of the books in the series, and also owns trademarks related to its *Harry Potter* film and merchandising projects. (*Id.* ¶ 15).[1]

The *Harry Potter* books tell the story of a young orphan who discovers that he has magical powers and who attends a school

for wizards called "Hogwarts School of Witchcraft and Wizardry." (Pl 56.1 ¶¶ 10, 17). Harry's parents, James and Lily Potter, also had magical powers but were killed when Harry was a baby. (*Id.* ¶ 15). After his parents' death, Harry is dropped off at the home of his aunt, uncle, and cousin, all of whom are "muggles"—i.e. ordinary human beings who do not have magical powers. (*Id.* ¶ 13). On Harry's eleventh birthday, a friendly giant named "Rubeus Hagrid," who is the "Keeper of Keys and Grounds" at Hogwarts, delivers a letter inviting Harry to attend the Hogwarts school. (*Id.* ¶ 17). Hagrid also informs Harry that his parents did not die in a car crash, as Harry had been told, but were in fact killed by an evil wizard named "Lord Voldemort." (*Id.* ¶ 18). Hagrid takes Harry to "Diagon Alley," a place with many magical shops where Harry buys supplies for his studies at Hogwarts. (*Id.* ¶ 19). At one of the shops, Hagrid buys Harry a pet owl because owls are used by wizards to deliver mail. (*Id.;* see also Declaration of Jennifer D. Choe ("Choe Decl."), Exh. 1 at 51–52, 61–62, 81, 87). Later, on his way to Hogwarts, Harry meets other students from the school, including a hapless boy named Neville Longbottom. (*Id.* ¶¶ 19–21). While at Hogwarts, Harry plays "Quidditch," a game played on flying broomsticks, and is also given his own flying broomstick, the "Nimbus 2000," by one of his teachers.(*Id.* ¶ 25). Harry also stumbles across an enchanted mirror called the "Mirror of Erised." (Choe Decl., Exh. 1 at 207–09, 212–14). Those who look into this mirror can see visions of their deepest desires; for example, when Harry looks at the mirror he sees his deceased parents standing behind him. (*Id.*).

---

1. Crossclaim defendants ABC Corporations (1 through 99) are as yet unnamed corporations which have contracted with plaintiffs to produce and distribute merchandise related to the *Harry Potter* books and films.

The first *Harry Potter* book, *Harry Potter and the Philosopher's Stone,* was published in the United Kingdom by Bloomsbury Publishing PLC in 1997. (Pl. 56.1 ¶ 6). In October 1998, Scholastic published this book in the United States under the title *Harry Potter and the Sorcerer's Stone.* Since then Scholastic has published three other Harry Potter books: *Harry Potter and the Chamber of Secrets,* published in June 1999; *Harry Potter and the Prisoner of Azkaban,* published in October 1999; and *Harry Potter and the Goblet of Fire,* published in July 2000. (*Id.* ¶ 26). All of the books in the *Harry Potter* series have enjoyed tremendous commercial success. (*Id.* ¶ 29).

The covers of all four books contain illustrations by Mary GrandPré, an illustrator hired by Scholastic. GrandPré also created illustrations for the chapter headings in all four books, as well as for the September 20, 1999 issue of *Time* magazine, which contained a cover story about *Harry Potter.* (See Declaration of Mary GrandPre ¶¶ 2, 3). Though the four cover illustrations differ, in all of them Harry is depicted as a young boy with dark brown or black hair and black-framed eyeglasses with circular lenses. (See Choe Decl., Exh. 1–4). In all of the illustrations Harry has a scar in the shape of a lightning bolt on his forehead, and is engaged in some kind of action (e.g. flying on a broomstick, or raising his magic wand in the air.) (*Id.*).

### B. *Defendant/Counterclaim Plaintiff and Her Works (Prior to 1999)*

In 1986, Stouffer, together with a group of friends and family, founded Andé Publishing Company ("Andé") in Camp Hill, Pennsylvania. (*Id.* ¶ 32). Andé sought to publish a series of children's books, collectively referred to as *The Baker's Dozen.* (*Id.* ¶ 33). The series was to consist of ten titles, each of which would be published in monthly installments; each installment would include a story booklet, an activity booklet, and a coloring booklet. (*Id.* ¶¶ 34, 35). However, Andé did not produce all of the booklets for its planned series, and filed for bankruptcy in September 1987. (*Id.* ¶ 41). While in operation the company produced only one monthly installment (consisting of a story booklet, coloring booklet, and activity booklet) for two of its titles, specifically *Rah* and *Myn and Memory Mountain ("Myn").* (*Id.* ¶ 37, 38). It is undisputed that Andé never sold any of its booklets in the United States or elsewhere (*Id.* ¶ 43) and never sold any merchandise related to the two booklets it produced. (*Id.* ¶ 44).

The *Rah* booklet tells the story of the "Muggles," who are tiny,[2] hairless creatures with elongated heads, narrow limbs, and plump bellies, and who "understand all languages, even those of the animals." (See Choe Decl., Exh. 7). Muggles live in the ruins of land called "Aura," which was ravaged by war and has been in darkness for many years. (*Id.*) Aura is rejuvenated, however, when two human babies, carried by a lily pad, arrive on its shores. (*Id.*). The two babies had been sent away from their own war-torn home by their mother, and upon their arrival sunlight returns to Aura and the Muggles are given "the gift of new life." (*Id.*; see also Second Amended Answer and Counterclaims ("SAAC"), Exh. 9).

---

**2.** The text of the *Rah* booklet is unclear with respect to the size of the Muggles. At one point in the story the reader is told that "[t]he average height of a Muggle is about 18 inches tall. Some are smaller, but none are ever taller than 20 inches." (Choe Decl., Exh. 7). Later in the booklet, however, Muggles are seen riding on the backs of ants and bees, an activity that would require the Muggles to be significantly smaller than 18 inches. Despite this lack of clarity as to the Muggles' size, it is undisputed that Muggles are significantly smaller than human beings.

To promote the *Rah* booklet, Andé placed an advertisement in the March 1987 issue of *Playthings* magazine. (See Choe Decl, Exh. 23). The advertisement contained a drawing of several Muggles and the accompanying text also mentioned Muggles. (*Id.*). Stouffer refers to this advertisement in her counterclaims (within a section entitled "Stouffer's Trademark Rights"), and also attached a copy of the advertisement as an exhibit to the counterclaims. (SAAC ¶ 83, Exh. 12). However, in that copy, unlike in the actual advertisement that appeared in *Playthings,* the words "Muggle's$_{TM}$ From RAH$_{TM}$" appear in large type below the drawing of the Muggles. (SAAC, Exh. 12). Plaintiffs assert that the additional phrase was recently added by Stouffer in order to bolster her assertion that she holds trademark rights in the term "Muggles." (See Pl. Memorandum in Support of the Motion for Sanctions at 15). Stouffer concedes that the copy attached to her counterclaims differs from the version of the advertisement that actually ran in *Playthings.* (See Def. Memo in Opposition to the Motion for Sanctions at 4). However, she maintains that she attached the altered copy to her counterclaims in the good faith belief that "it accurately depicted the ad as run in March of 1987." (*Id.*) Stouffer does not offer a specific explanation as to how the additional phrase appeared, but maintains that Andé's art department routinely modified copies of prior advertisements for later use. Therefore, she asserts that it is possible, if not likely, that "Muggle's$_{TM}$ From RAH$_{TM}$" was "added by Andé's art department at some time during the late 1980's." (*Id.*)

In connection with this litigation, Stouffer has produced booklets entitled *The Legend of Rah and the Muggles* that were allegedly created by Andé in the 1980's. (See Choe Decl., Exh. 17–19). However, plaintiffs have submitted expert testimony indicating that the words "The Legend of" and the words "and the Muggles," which appear on the title pages of these booklets, could not have been printed prior to 1991. (See Pl. 56.1 ¶¶ 67–71). According to plaintiffs' expert witness—whose testimony Stouffer does not rebut—the printing technology employed in the application of those words to the title pages was invented in 1985; however, because the specific printer used to print those words was between six and ten years old at the time the words were printed, "The Legend of" and "and the Muggles" could not have been placed on the title pages before 1991 (i.e. four years after Andé's bankruptcy). Stouffer concedes that these additional words were added to the title pages of the booklets after the booklets were originally printed, although she does not know exactly when the words were added or by what printing method. (Defendant's Statement Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 65, 67).

Andé's *Myn* booklet tells the story of creatures called "Myn," who have very large ears and live on a volcanic island off the coast of Australia. (Choe Decl., Exh. 10). The island is known as "Circle Island" because of the "ball-like projectiles" called "REM" that are released from the island's volcano. (*Id.*) REM throw off information as they fly through the air, although they can only be seen by the Myn and by visitors to the island who drink from the Well of Desire. (*Id.*) The Well of Desire is located on the north side of the island on a mountainous ridge called Memory Mountain and is fed by water from Diamond Falls. (*Id.*) Those who drink from the well are able to answer any question or problem easily. (*Id.*)

Stouffer maintains that in addition to the *Rah* and *Myn* booklets, Andé also created a coloring book version of a third title, *Larry Potter and His Best Friend Lilly* (Def. 56.1 ¶ 37–38), although a com-

pleted version of this booklet has not been produced in this litigation. (Pl. 56.1 ¶¶ 108, 109). Stouffer has produced a "printer's proof," which was purportedly the basis for *Larry Potter and His Best Friend Lilly* (*Id.*; Choe Decl., Exh. 27), although the printer's proof has no title page and contains only one reference to "Larry Potter." (Choe Decl., Exh. 27). (Throughout the rest of the printer's proof the main character is referred to simply as "Larry." (*Id.*)) Plaintiffs have produced evidence indicating that the one paragraph referring to "Larry Potter" was printed using fonts that were not available until 1993. Thus, plaintiffs contend that this part of the printer's proof could not have been created before Andé ceased operations in 1987 and was in fact created by Stouffer to give the false impression that she had published a "Larry Potter" book prior to this litigation. (See Pl. 56.1 ¶¶ 114–118; Pl. Reply Memorandum in Support of the Motion for Sanctions at 10). Stouffer does not dispute plaintiffs' evidence regarding the fonts used in the printer's proof but contends that the document was not altered in connection with this litigation. She maintains that because she continued to revise *Larry Potter and His Best Friend Lilly* into the early 1990's, the printer's proof that she initially claimed to have been printed by Andé in the 1980's may have actually been printed later. (See Def. Memorandum in Opposition to Motion the for Sanctions at 12).

The story contained in the printer's proof describes a once happy boy named Larry who has become sad. (See Choe Decl., Exh. 27 at 2, 4). His best friend Lilly does not know why Larry is sad and tries to cheer him up by bringing him gifts and singing to him, but none of her efforts raise Larry's spirits. (*Id.* at 6–10). Finally, Lilly decides to throw a party for Larry and gathers all of his friends together in a park. (*Id.* at 14). When Larry arrives, Lilly and the others are surprised to see

that Larry is wearing eyeglasses. Apparently, he had been sad because he was having trouble seeing and was fearful of how he would be treated once he started wearing glasses. (*Id.* at 18–22).

After Andé's bankruptcy, Stouffer formed a new publishing venture called Book Cook, Inc. ("BCI"). (Pl. 56.1 ¶ 122). Although the parties dispute whether BCI was formally incorporated (*Id.* ¶ 123; Def. 56.1 ¶ 123), it is undisputed that BCI only existed for a brief period of time and ceased operations in October 1988. (Pl. 56.1 ¶ 124). While in operation BCI printed at least five booklets: (i) *Lilly;* (ii) *Myn;* (iii) *Silver Linings;* (iv) *The Land of the Nother–One;* and (v) *The Fat Frog.* (*Id.* ¶ 128). The *Silver Linings* booklet contains a character named "Nimbus," a brave warrior who becomes prime minister of the imaginary land of "Troposonia." (See Choe Decl., Exh 31). The drawings of Nimbus depict him as an adult human male, although he and the other characters in the booklet are referred to as "cloud people." (*Id.*) Nimbus travels through the clouds on horseback accompanied by his dog, Thor. (*Id.*)

The parties disagree as to whether BCI also printed a version of *Larry Potter and His Best Friend Lilly.* (Pl. 56.1 ¶¶ 144–161; Def. 56.1 ¶ 161, 205). Stouffer has not produced any original versions of a booklet with this title, although she has produced two color photocopies of a booklet entitled *Larry Potter and His Best Friend Lilly* that was purportedly published by BCI in 1988. (Pl. 56.1 ¶ 147). Plaintiffs have produced evidence indicating that the original documents from which these photocopies were produced could themselves not have been created before 1993. (*Id.* ¶¶ 148, 154). Also, as with the Andé printer's proof of *Larry Potter and His Best Friend Lilly* (see *supra*), these photocopies contain only one paragraph

referring to "Larry Potter." (See Choe Decl., Exh. 24. 25). Plaintiffs have produced evidence indicating that the one "Larry Potter" paragraph is printed in a different typeface from the rest of the story and was created using printing technology unavailable during BCI's existence. (Pl. 56.1 ¶¶ 151–53). Stouffer attributes this discrepancy in typeface to the fact that she continued to revise the story into the 1990's. (See Memorandum in Opposition to the Motion for Sanctions at 12).

The photocopied versions of *Larry Potter and His Best Friend Lilly* allegedly created by BCI also contain illustrations of the Larry character. (See Choe Decl., 24–26). These illustrations depict a young boy with brown or orange hair (depending on the particular illustration) and eyeglasses. (*Id.*) The lenses of the boy's glasses are rounded (though not circular) and the frames are speckled with different colors (including yellow, orange, and brown). (*Id.*) In the illustrations, Larry is either standing or sitting, but is not shown in any active pose; his facial expression is either a smile or a frown, depending on the particular illustration. (*Id.*)

The parties disagree as to whether BCI also printed a booklet entitled *The Legend of Rah and the Muggles*. (*Id.* ¶¶ 130–143; Def. 56.1 ¶¶ 142–43, 198). Stouffer has not produced an original version of such a booklet and people who were associated with BCI in the late 1980's have testified that BCI never published a booklet with that title. (Pl. 56.1 ¶¶ 131, 132). Stouffer has produced a photocopy of *The Legend of Rah and the Muggles* that was purportedly published by BCI in 1988, although plaintiffs have produced evidence indicating that this copy contains a type of printing that was not available until the 1990's. (*Id.* 134–38; Choe Decl. Exh. 20). Plaintiffs have also submitted testimony from former BCI employees and associates who do not recall the company ever publishing a booklet with "Muggles" in the title. (Declaration of Ann Fitzpatrick ¶¶ 17–21; Declaration of Gerald Alpert ¶¶ 6–7; Deposition of William O'Brian at 35:11 to 36:7; Deposition of J. Glenn Ebersole, Jr., at 65:23 to 66:8). Notwithstanding such testimony, Stouffer maintains that BCI did publish a booklet entitled *The Legend of Rah and the Muggles*. (Def.56.¶¶ 128–29). And though she does not dispute plaintiffs' evidence regarding the printing used in the copy submitted to the Court, she maintains that she continued to revise the booklet after BCI's demise and thus the printing in that copy could date from the early 1990's. (See Memorandum in Opposition to the Motion for Sanctions at 9).

In April 1988, Stouffer obtained copyright registration for a screenplay based on the *Rah* storyline. The screenplay was entitled "RAH The Light," although the accompanying application for copyright registration listed the title as "RAH The Movie." (See Choe Decl., Exh. 16). Stouffer included a copy of the screenplay as an exhibit to her counterclaims, although the cover page of that copy bears the title "The Legend of RAH the Light and the Muggles." (See SAAC ¶ 92, Exh. 18). Plaintiffs assert that the copy attached to Stouffer's counterclaims was altered by Stouffer in order to strengthen her assertion of trademark rights in the term "Muggles." (Pl 56.1 ¶ 177). Stouffer maintains that the change in the screenplay's title was made long before this action was filed and that such change was made to keep the screenplay "consistent with the title to the series of books as it evolved." (Declaration of Nancy K. Stouffer ("Stouffer Decl.") ¶ 33).

Stouffer also claims that she created a version of *The Legend of Rah and the Muggles* that was published in 1997 by ALCD, a company owned by her husband, David Stouffer. (SAAC ¶ 60). Stouffer

has submitted a photocopy of the "limited edition promotional copy" that was produced by ALCD. (*Id.*, Exh. 1). In the ALCD book, which is significantly longer than the earlier *Rah* booklet created by Andé, each Muggle has a job to do on Aura, and the Muggles wear emblems on their chests to identify the kind of work they do.[3] (*Id.* at 50). The two human babies that arrive in Aura on the lily pad are given the names "Rah" and "Zyn" by the Muggles. (*Id.* at 34–35). Rah is intelligent and kind and becomes a leader of the Muggles. (*Id.* at 115–121). Zyn is jealous of his brother's intelligence and success (*id.*), and develops a small following of Muggles, called Nevils, with whom he leaves Aura for a dark and rocky island called Dezra. (*Id.* at 139–47). Once on Dezra, the Nevils' bodies adapt to their new environment: their eyes become "cat-like," enabling them to see in the dark; hair grows on their arms and legs; their fingernails grow long and resemble tiger claws; and their hands and feet become webbed. (*Id.* at 160). The Nevils kidnap Rah from Aura, although he is later rescued by the Muggles. (*Id.* at 168–92). One of the characters in the ALCD book is Seymour, a talking albino hawk; Seymour is used as a scout by Rah to observe the Nevils on Dezra, and also delivers food to Dezra. (*Id.* at 149–54, 191).

### C. *Stouffer's Activities Since 1999*

In September 1999, Stouffer wrote to Scholastic regarding *Harry Potter and the Sorcerer's Stone.* (Complaint ¶ 22; Choe Decl., Exh. 45). In that letter, Stouffer stated that the *Harry Potter* book violated her copyrights and trademarks, specifically her trademark rights in the term "Mug-

gle(s)." (*Id.*) The letter did not mention any infringement by plaintiffs upon Stouffer's intellectual property rights in the "Larry Potter" character or *Larry Potter and His Best Friend Lilly.* (*Id.*) In November 1999, after further communication between Scholastic and Stouffer failed to resolve the parties' differences, plaintiffs filed this action for declaratory and injunctive relief. (Pl. 56.1 ¶ 191). Stouffer filed her counterclaims on January 4, 2001. (*Id.* ¶ 192).

In the spring of 2001, *The Legend of Rah and the Muggles* was published by Thurman House, LLC, a Maryland publishing company. (Pl 56.1 ¶ 198). This version of the book is similar, though not identical, to the earlier version of *The Legend of Rah and the Muggles* created by ALCD. (See Choe Decl., Exh 43). In the Thurman House version, Muggles have an average height of three and one-half feet (*Id.* at xv). The jobs performed by the Muggles in the Thurman House version include four of the "Keeper" jobs listed in the ALCD version (see n. 2, *supra*), as well as "Keeper of the Beaches"; "Keeper of the Villages"; "Keeper of the Aviary"; and "Keeper of the Bees." (*Id.* at 98). Finally, the Thurman House version contains more detailed descriptions of the Nevils (the evil Muggles who flee to Dezra with Zyn). (*Id.* at 190–93).

### II. Motion for Summary Judgment

### A. Legal Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a

---

**3.** A Muggle who works as a "Keeper of the Garden" wears a flower emblem; one who works as a "Keeper of the Children" wears a bell emblem; one who works as a "Keeper of the Mills" wears a wheel emblem; one who works as a "Keeper of the Light" wears a candle emblem; one who works as a "Keeper of the Food" wears a four-leafed clover emblem; and those who work as "Craftsmen" wear a scissors emblem. (SAAC, Exh. 1 at 50).

judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences and ambiguities are resolved in the non-movant's favor. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *See AGV Prods. v. Metro-Goldwyn–Mayer, Inc.*, 115 F.Supp.2d 378, 386 (S.D.N.Y.2000) (citation omitted). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *See Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Moreover, "conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). On cross-motions for summary judgment, the rule governing inferences and burden of proof is the same as for unilateral summary judgment motions. That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts. *See AGV Prods.*, 115 F.Supp.2d at 386.

**B. Discussion**

Plaintiffs have moved for summary judgment with respect to their claims for declaratory judgment and injunctive relief, as well as with respect to Stouffer's counterclaims and crossclaims. However, granting the relief sought by plaintiffs in their claims (i.e. declaring that plaintiffs have

*not* violated Stouffer's intellectual property rights) necessitates the dismissal of Stouffer's counterclaims (which are for violations of those same rights). Accordingly, the Court considers both sides' claims together, and, as the parties have done in their briefs, analyzes plaintiffs' motion for summary judgment by assessing each of Stouffer's counterclaims.

1. *Trademark Infringement, False Designation of Origin, and Unfair Competition*

Stouffer's first four counterclaims are for (i) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125 (SAAC ¶¶ 119–32); (ii) trademark infringement in violation of New York law (SAAC ¶¶ 133–37); (iii) false designation of origin in violation of the Lanham Act (SAAC ¶¶ 138–51); and (iv) unfair competition in violation of New York law. (SAAC ¶¶ 152–58). To prevail on any of these claims Stouffer must show that plaintiffs have used the intellectual property at issue in a manner likely to cause consumer confusion. *See, e.g., Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 309–10 (S.D.N.Y.2000) (claims of trademark infringement and false designation of origin under the Lanham Act require plaintiffs to show likelihood of confusion); *see also Waldman Publi'g. Corp. v. Landoll, Inc.*, 43 F.3d 775, 781–85 (2d Cir.1994) (likelihood of consumer confusion is a necessary element of false designation of origin claim alleging "reverse passing off"); *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F.Supp. 318, 328 (S.D.N.Y.1997) (where there is no likelihood of confusion for purposes of Lanham Act claim, common law trademark infringement claim also fails); *Girl Scouts of the United States of Am. v. Bantam Doubleday Dell Pul'g. Group, Inc.*, 808 F.Supp. 1112, 1131 (S.D.N.Y.1992) (state law unfair competition claim failed where plaintiffs failed to show likelihood of confusion), *aff'd*, 996 F.2d 1477 (2d Cir.1993).

■ When assessing the likelihood of consumer confusion, courts in this district look to the eight factors identified by the Second Circuit in *Polaroid v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Those factors are (i) the strength of the claimant's mark; (ii) the degree of similarity between the claimant and defendant's marks; (iii) the proximity of the products; (iv) the likelihood that either party will "bridge the gap" and use the mark on products closer to the other's areas of commerce; (v) the sophistication of the buyers; (vi) the quality of the defendant's product; (vii) actual confusion; and (vii) the defendant's good or bad faith. *See Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir.1999) (citing *Polaroid*). However, while all of these factors are relevant, the application of the *Polaroid* test is not a mechanical process "where the party with the greatest number of factors weighing in its favor wins." *Physicians Formula Cosmetics Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 85 (2d Cir.1988). Rather, a court should focus on the ultimate question of whether consumers are likely to be confused as to the source of the two parties' merchandise. *See Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 580 (2d Cir.1991). In this case the Court need not address each of the *Polaroid* factors individually in order to answer the ultimate question regarding likelihood of confusion. Rather, by simply comparing the *Harry Potter* books to Stouffer's works,

and by examining the supposed similarities between the works cited by Stouffer in her briefs, the Court is able to conclude that no reasonable juror could find a likelihood of confusion as to the source of the two parties' works.

Stouffer's claims are based on several attributes of the *Harry Potter* books. First, she claims that plaintiffs' use of the terms "muggle" and "muggles" are likely to cause consumer confusion.[4] (SAAC ¶¶ 123, 126, 128). However, plaintiffs have not used either of these terms as trademarks. Rather, plaintiffs have used "muggles" to refer to certain characters in the *Harry Potter* books, and such use is markedly different from Stouffer's use of "muggles" in her various *Rah* books. In *Harry Potter*, a "muggle" is simply the term used for ordinary human beings, i.e. those who do not have magical powers. In Stouffer's works, "Muggles" are tiny, hairless creatures with elongated heads who live in a fictional, post-apocalyptic land called Aura. Stouffer's Muggles may have the basic physical characteristics of human beings, but their diminutive size (see n. 1, *supra*) and distorted physical features (see Choe Decl., Exhs. 7, 43 (at xiv-xv), 67 (at 3)) clearly indicate that they are not human beings. Also, while Stouffer's Muggles may not have magical powers, they do have the superhuman ability to talk to animals. (See Choe Decl., Exh. 43 at xv, 120). Stouffer has not produced any evidence indicating that there has been actual confusion between the two uses,[5] nor is

---

**4.** Because the Court finds that Stouffer cannot satisfy the other necessary component of her trademark claims, i.e. likelihood of confusion, the issue of whether Stouffer's use of "Muggle" and "Muggles" entitles her to trademark protection need not be reached. However, given the meager sales and minimal business activities of Andé, BCI, and Thurman House, the Court has serious reservations as to whether Stouffer has any trade-

mark rights with respect to "Muggle" or "Muggles."

**5.** Stouffer maintains that actual confusion has occurred and in support of that assertion points to her "receipt of numerous e-mails and letters accusing *her* of trying to 'steal' or capitalize on marks associated with *Harry Potter*." (See Souffer Surreply Memorandum at 5–6 (emphasis in original)). However, there is nothing in the record, beyond Stouf-

there any evidence in the record indicating bad faith on plaintiffs' part. Accordingly, the Court finds that there is no likelihood of confusion between plaintiffs' use of "muggle(s)" and Stouffer's use of "Muggles."

Similarly, the plaintiffs' use of "Harry Potter" as a character in the *Harry Potter* books is not likely to cause confusion with Stouffer's use of "Larry Potter." As an initial matter, the evidence in the record does not conclusively establish that Stouffer even used the words "Larry Potter" in any books published prior to the commencement of this litigation. Those words appear only in a single paragraph of the Andé "printer's proof," and on the title page and in one paragraph of the *Larry Potter and His Best Friend Lilly* booklet allegedly created by BCI. (See *supra.*) The undisputed evidence produced by plaintiffs indicates that the paragraphs containing the words "Larry Potter" were printed utilizing technology that was not available while Andé and BCI were in existence. (See Pl. 56.1 ¶¶ 106–119, 144–153). And the photocopies of the BCI booklet submitted by Stouffer also could not have been created while BCI was operating. (Pl. 56.1 ¶¶ 154–157). In fact, the only evidence in the record indicating that Stouffer actually created a booklet containing the words "Larry Potter" prior to 1999 is the testimony of her nephew, William O'Brian and two of her friends. (See Declaration of William J. O'Brian ¶¶ 6–7; Dec-

laration of Carla M. Palese ¶ 7; Declaration of Robert Sgringoli, Jr. ¶¶ 5–6). These three persons all claim that Stouffer gave them individual copies of BCI's *Larry Potter and His Best Friend Lilly* during the early to mid–1990's. (*Id.*).

However, even assuming, *arguendo,* that Stouffer had used "Larry Potter" in her works prior to this litigation, plaintiffs' use of "Harry Potter" does not create a likelihood of confusion. Stouffer's "Larry Potter" appears in an 11–page booklet about a boy who is sad because he has to wear eyeglasses. "Larry" has brown or orange hair and glasses with non-circular lenses and speckled brown frames. (See Choe Decl, Exh. 25). In contrast, "Harry Potter" is a young orphan boy with dark brown or black hair, a scar in the shape of a lightning bolt on his forehead, and distinctive eyeglasses with black frames and circular lenses. (See Choe Decl., Exh. 1–4). After discovering that he has magical powers and enrolling at a school for young wizards, Harry has many adventures, which are described throughout the course of the four *Harry Potter* books, each of which is several hundred pages in length. (*Id.*). Aside from the similar, though not identical, names of the main characters and the fact that both "Larry" and "Harry" are boys with glasses, Stouffer's booklet and plaintiffs' books, along with their accompanying illustrations, have almost nothing in common. (See *infra* ). Accordingly, no reasonable juror could find a likelihood of confusion between "Larry Potter" and "Harry Potter." [6]

fer's conclusory allegations, which indicates that Stouffer ever received such letters, since neither the letters nor printouts of the electronic mail messages have been produced. Stouffer did attach printouts of several electronic mail messages to her Second Amended Answer and Counterclaims (SAAC, Exh. 31). However, those messages were sent to Stouffer by fans of the *Harry Potter* series who were upset by the position she has taken in this litigation and do not indicate actual confusion. To the contrary, the authors of those e-

mails clearly recognize that *Harry Potter* and *The Legend of Rah and the Muggles* come from two separate sources. (*Id.*)

6. In her counterclaims, Stouffer refers to her use of a character named "Lilly Potter" and asserts that plaintiffs use of a character named "Lily Potter" is likely to cause confusion. (SAAC ¶¶ 142, 143). However, in the papers submitted by Stouffer in connection with the instant motions, she does not mention her use of "Lilly Potter" as a basis for

Stouffer also argues that there is a likelihood of confusion based on her use of "Nevils" and plaintiffs' use of a character named "Neville Longbottom." However, Stouffer's Nevils are a group of Muggles whose original non-human appearance becomes even more distorted during the course of *The Legend of Rah and the Muggles*. (See Choe Decl., Exh 67 (at 130–31, 160)). Neville Longbottom, on the other hand, is a young boy who is one of Harry Potter's classmates at the Hogwarts school. Neville is a "half-and-half" since his mother was a witch and his father was a muggle. (See Choe Decl., Exh. 1 at 125). However, despite Neville's status as a "half-Muggle," he does not share any of the physical attributes of Stouffer's Nevils, nor are his actions at all similar to those of the Nevils. Stouffer's Nevils are villainous, whereas Neville Longbottom is merely hapless. There is, of course, some similarity between the word "Nevils" and the name "Neville," but, as plaintiffs point out, "Neville" is simply a common British name. Accordingly, the mere similarity of the words "Nevils" and "Neville" does not create a likelihood of confusion between plaintiffs' and Stouffer's works.

Similarly, the appearance of the word "Nimbus" in both the *Harry Potter* books and in Stouffer's *Myn* booklet is not likely to cause confusion. First, the Court takes judicial notice of the fact that the word "nimbus" can be found in the dictionary and does not represent a fanciful creation of either Stouffer or plaintiffs.[7] Secondly, the two parties use the word in completely different ways. Stouffer's "Nimbus" is a

warrior and prime minister of the cloud people of "Troposonia," and is depicted as an adult male with shoulder-length hair. (See Choe Decl., Exh 31). In *Harry Potter*, the "Nimbus 2000" is a flying broomstick ridden by Harry during games of Quidditch. (See Choe Decl., Exh. 1 at 165–70). Both parties works use the word "Nimbus" as a noun, but no reasonable juror could find a likelihood of confusion between the works based on such a superficial similarity.

Stouffer also asserts that plaintiffs' use of messenger owls in the *Harry Potter* books could create confusion between *Harry Potter* and *The Legend of Rah and the Muggles*. However, Stouffer's work does not contain owls who deliver mail; rather, it contains an albino hawk named Seymour who acts as a scout for the leader of the Muggles and who delivers food to the Nevils on the island of Dezra. (See Choe Decl., Exh. 67 at 149–54, 191). No reasonable juror could find a likelihood of confusion between the two parties' works based simply on the fact that both contain birds who are employed to carry an object from one place to another. Similarly, the "Mirror of Erised" in the *Harry Potter* books and the "Well of Desire" in Stouffer's *Myn* are not similar enough to give rise to a likelihood of confusion. The Mirror of Erised is a mirror that allows those who look into it to see visions of their deepest desires. (See Choe Decl., Exh. 1 at 207–09, 214). In contrast, the Well of Desire gives those who drink from it the ability to solve any question or problem easily. (Choe Decl., Exh. 10). Although the Mirror of

---

confusion with plaintiffs' works. (See Declaration of Thomas McNamara ¶¶ 13–26). Also, none of the evidence in the record indicates that Stouffer has ever used the name "Lilly Potter" in her books. (The "Lilly" character in *Larry Potter and and His Best Friend Lilly* has no last name and, as the title indicates, she is a friend of Larry Potter's, not a relative). (See Choe Decl., Exh, 25). According-

ly, plaintiffs' use of "Lily Potter" could not create a likelihood of confusion.

7. A "nimbus" is defined as either "a cloudy radiance said to surround a deity when on earth," or "a uniformly gray rain cloud that extends over the sky." (See American Heritage Dictionary (2d College Ed.1982) at 842).

Erised and the Well of Desire are both magical objects that contain some form of the word "desire" in their name, they are hardly similar enough to create a likelihood of confusion since they are completely different objects which perform dissimilar functions.

Finally, the fact that *Harry Potter* contains a character whose job title is "Keeper of the Keys and Grounds" does not give rise to a likelihood of confusion with *The Legend of Rah and the Muggles*, in which each Muggle works as a "Keeper of" various objects. (SAAC, Exh. 1; Choe Decl., Exh. 43 at 98). "Keeper" is a commonly used word and is often used to describe a particular job; the mere fact that both parties' works use that word to describe characters' job titles is not likely to cause confusion. And because there are no additional similarities between the characters who perform these "Keeper" roles, there can be no likelihood of confusion based on the usage of the words "Keeper of" in both works.

In sum, the similarities between Stouffer's books and the *Harry Potter* series are minimal and superficial, and even when considered altogether they could not give rise to a likelihood of confusion. And because likelihood of confusion is a necessary element of Stouffer's first four counterclaims, she cannot maintain any of those claims. Accordingly, plaintiffs' motion for summary judgment seeking to dismiss those claims is granted.

### 2. *Dilution and Tarnishment*

■ In her fifth counterclaim, Stouffer asserts a claim for injury to business reputation (tarnishment) and dilution (blurring) under New York General Business Law § 360–l. (SAAC ¶¶ 159–66). However, a prerequisite for asserting a claim under this statute is the ownership of "an extremely strong mark" that is either "distinctive" or has acquired secondary mean-

ing. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983); *Allied Maintenance v. Allied Mechanical Trades,* 42 N.Y.2d 538, 542–46, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162 (1977). Thus, to merit protection under the New York dilution statute, a plaintiff cannot simply show that she possesses trademark rights; rather, she must possess a trademark or name which is "truly of distinctive quality" or which has "acquired a secondary meaning in the mind of the public." *Allied,* 42 N.Y.2d at 546, 399 N.Y.S.2d 628, 369 N.E.2d 1162 ("Allied" not sufficiently distinctive to warrant protection); *cf. Tiffany & Co. v. Tiffany Productions, Inc.,* 147 Misc. 679, 264 N.Y.S. 459 (N.Y.Sup.Ct.), *aff'd,* 237 A.D. 801, 260 N.Y.S. 821 (1st Dep't 1932), *aff'd,* 262 N.Y. 482, 188 N.E. 30 (1933) (enjoining use of "Tiffany" by a movie producer and distributor in action by makers of Tiffany jewelry). While the Court did not reach the issue of whether Stouffer possesses sufficient trademark rights in the terms "Muggle" and "Muggles" for purposes of pursuing her infringement claims (see n. 3, *supra* ), the question of whether she owns "an extremely strong mark" for the purposes of a state law dilution claim can only be answered in the negative.

■ Even when viewed in the light most favorable to Stouffer, the evidence in the record indicates that sales of *Rah* and *The Legend of Rah and the Muggles* were meager at best. Stouffer concedes that Andé never sold any of the booklets it created. (See Pl. 56.1 ¶¶ 42, 43; Def. 56.1 ¶¶ 42, 43). She claims that Andé sold various promotional items bearing the "Muggles" mark, but offers no evidence of such sales aside from her own conclusory allegations. (See Def. 56.1 ¶ 45). Thurman House sold at most six thousand copies of *The Legend of Rah and the Muggles.* (See Choe Decl., Exh 71 (Deposition of Allan Thurman

Hirsh, III at 40–41)). And the only evidence that BCI sold any merchandise are: (i) Stouffer's conclusory allegation that the company sold booklets in supermarkets and drug stores in Pennsylvania, Maryland, and Virginia in 1988 and 1989 (see Stouffer Decl. ¶ 40); and (ii) invoices purporting to be records of sales to Great Northern Distributors in 1988. However, the BCI salesperson listed on the invoices and the customer to whom the goods were allegedly sold have both testified that the sales referred to in the invoices never took place. (See Declaration of Joan Korbin Wright ¶¶ 12–15; Declaration of Randolph Slaff, ¶¶ 33–45; Choe Decl., Exh. 36). The customer has also testified that the signature on the invoice is not his. (Slaff Decl., ¶¶ 35–36, 39–40, 43–44). Even assuming that these invoices are genuine, they do not indicate whether any of the merchandise allegedly sold to Great Northern contained the "Muggle" or "Muggles" marks. (See SAAC, Exh. 16). In addition, a letter from Great Northern to Stouffer dated, August 16, 1988, states that "sales of the books were very slight . . . and have remained so." (Stouffer Decl., Exh. C). In short, even if all of Stouffer's assertions regarding her commercial use of "Muggle" or "Muggles" are accepted as true, no reasonable juror could find that such use is sufficient to establish that the marks are "extremely strong."[8] Therefore Stouffer cannot pursue a dilution claim under New York GBL § 360–1. Accordingly, plaintiffs' motion for summary judgment with respect to Stouffer's fifth counterclaim is granted.

### 3. Copyright Infringement

■ Stouffer's sixth counterclaim is for copyright infringement under 17 U.S.C. § 501. Specifically, she alleges that the cover illustrations on the *Harry Potter* books infringe upon her copyrights in an illustration from *Larry Potter and His Best Friend Lilly*. (See SAAC ¶ 168). However, in order to pursue this claim she must establish, *inter alia*, that the plaintiffs' illustration and her illustration are substantially similar, *see, e.g., Novak v. National Broadcasting Co.*, 716 F.Supp. 745, 750 (S.D.N.Y.1989) (noting that "substantial similarity" is an essential element of actionable copying), and that the similarities concern the protectable elements of Stouffer's illustration. *See Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (holding that summary judgment is appropriate if the similarity between two works concerns only noncopyrightable elements of plaintiff work, or if no reasonable trier of fact could find the works to be substantially similar).

However, as set forth above (see Section II.B.1, *supra* ), the illustrations are not substantially similar. While both Harry Potter and Larry Potter are depicted as young boys with dark hair and eyeglasses, such generic elements are not copyrightable. The protectable elements of Stouffer's illustration—Larry Potter's facial features, the shape and color of his eyeglasses, the style and color of his hair—are simply not present in plaintiffs' *Harry Potter* illustrations, and thus Stouf-

---

8. Stouffer has submitted no evidence relating to the marks' acquisition of secondary meaning in the marketplace. Nor is there any indication that "Muggle" or "Muggles" could be viewed as "truly distinctive," especially given the fact that these words have been used in commerce by third parties long before Stouffer created any of her works. (See Pl. Reply Memo at 9 n. 8 (noting earlier use of "Muggles" in a 1946 book entitled *Raggedy Ann in the Snow White Castle;* a 1959 book by Carol Kendall entitled *The Gammage Cup;* and a song entitled "Muggles," which was recorded in 1928 by Louis Armstrong)).

fer cannot sustain her claim for copyright infringement. Accordingly, plaintiffs' motion for summary judgment with respect to Stouffer's sixth counterclaim is granted.

In addition, the Court notes that there is no evidence in the record indicating that either Rowling or Mary GrandPré, the illustrator who created the *Harry Potter* covers, ever had access to Stouffer's works prior to this litigation. It is undisputed that Rowling had never been to the United States prior to the 1998 publication of *Harry Potter and the Sorcerer's Stone.* (See Declaration of J.K. Rowling ¶ 8). As a result, Stouffer's allegation that Rowling had access to Stouffer's works prior to this litigation is based on two pieces of circumstantial evidence: first, that some of Stouffer's works were displayed at a toy fair in Nuremberg, Germany in 1987; and second, that Stouffer's properties were available through a company in Cheshire, England. (See SAAC ¶ 106). However, there is no evidence whatsoever that Rowling attended the Nuremberg toy fair; in fact, Stouffer has admitted that her allegation that Rowling had access to Stouffer's works at that fair is based solely on the fact that Rowling was living in Europe when the fair occurred. (Stouffer Deposition (Choe Decl., Exh. 71) at 848:17 to 850:15). And with respect to the store in Cheshire, England in which Rowling may have had access to Stouffer's works, Stouffer has admitted that there is no evidence indicating that the company she refers to in her counterclaims ever sold her properties, nor even any evidence that the company operated a store. (Stouffer Deposition at 852:18 to 854:4, 830:9 to 832:22). Finally, Stouffer has failed to submit any evidence indicating that GrandPré ever saw Stouffer's works prior to this litigation.

### III. Motion for Sanctions

Plaintiffs have moved for sanctions based on Stouffer's alleged submission of falsified evidence. Specifically, plaintiffs have asked the Court to issue an order, pursuant to its inherent power, dismissing Stouffers's counterclaims with prejudice and directing Stouffer to reimburse plaintiffs for the attorneys' fees and costs that they have incurred in this action. The motion for sanctions is based upon Stouffer's alleged perpetration of a fraud upon the Court, namely her production of at least seven pieces of falsified evidence: (i) the altered *Playthings* advertisement that was attached to her counterclaims (SAAC, Exh. 12); (ii) the altered copies of *The Legend of Rah and the Muggles* (Choe Decl. Exh. 17–20); (iii) the altered copy of the "RAH" screenplay (SAAC, Exh. 18); (iv) drawings of "Muggles" merchandise that were altered to include the word "Muggles$_{TM}$" (Choe Decl, Exh. 63); (v) altered copies of *Larry Potter and His Best Friend Lilly* (Choe Decl., Exh. 24–27); (vi) the forged invoices that purport to record sales by BCI to Great Northern Distributors (SAAC, Exh. 16); and (vii) an altered draft agreement between BCI and Warner Publisher Services. (SAAC, Exh. 17; Choe Decl., Exh 37).

In order for the Court to grant sanctions based upon such a fraud, it must be established by clear and convincing evidence that Stouffer has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate" the action. *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989); *see also Shepherd v. American Broadcasting Cos., Inc.,* 62 F.3d 1469 (D.C.Cir.1995) (sanctions pursuant to a court's inherent power must be based on abusive litigation conduct that has been proven by clear and convincing evidence); *Pfizer, Inc. v. Int'l. Recitifier Corp.,* 538 F.2d 180, 195 (8th Cir.1976), *cert.denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977) (same); *McMunn v.*

*Memorial Sloan–Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002) (Buchwald, J.). Accordingly, the Court must examine the record with respect to each of the seven pieces of allegedly falsified evidence. Upon such examination, the Court finds Stouffer's conduct warrants sanctions.

## A. The Playthings Advertisement

It is undisputed that the copy of the *Playthings* advertisement that was attached to Stouffer's counterclaims is not a true and correct copy of the advertisement that appeared in the March 1987 issue of *Playthings.* See Section I.B., *supra.* The copy attached to Stouffer's counterclaims contains the phrase "Muggles$_{TM}$ from RAH$_{TM}$" whereas the advertisement that ran in *Playthings* did not. (Compare SAAC, Exh. 12 with Choe. Exh. 12). Stouffer does not offer a specific explanation as to how the additional phrase appeared, but maintains that Andé's art department routinely modified copies of prior advertisements for later use and therefore it is possible that the additional phrase was "added by Andé's art department at some time during the late 1980's." (See Def. Memo in Opposition to the Motion for Sanctions at 4). However, Stouffer offers no evidence to support this possible explanation for her submission of the altered advertisement: no one who worked in Andé's art department has testified that the company did indeed modify advertisements for later use, nor does Stouffer point to any later use of this particular advertisement. Furthermore, if Stouffer knew that Andé routinely altered advertisements for later use, it was incumbent upon her to determine whether the advertisement she submitted with her counter-

claims had been altered before submitting that ad as proof that the phrase "Muggles$_{TM}$ from RAH$_{TM}$" had appeared in *Playthings.* (See SAAC ¶ 83).[9] And since that phrase is the only portion of the advertisement relevant to Stouffer's claim that she had acquired trademark rights to the term "Muggles" prior to the publication of plaintiffs' *Harry Potter* series, its presence in the copy attached to the counterclaims—and its absence from the actual *Playthings* advertisement—indicate that Stouffer has willfully altered the document for purposes of perpetrating a fraud on the court. Accordingly, the Court finds that Stouffer's submission of the altered advertisement as an exhibit to her counterclaims represents sanctionable conduct.

## B. The Altered Copies of The Legend of Rah and the Muggles

It is undisputed that several booklets produced by Stouffer that bear the title "The Legend of Rah and the Muggles" were altered after their original printing. (Def. 56.1 ¶¶ 65, 67; see also Section I.B., *supra* ). Specifically, these booklets were altered such that their titles were changed from "RAH" to "The Legend of RAH and the Muggles." (Def. 56.1 ¶¶ 65, 67). Stouffer originally testified that she assumed such alteration occurred in the late 1980's (Stouffer Deposition at 625:4–12); however, after being confronted with evidence indicating that the addition of "The Legend of" and "and the Muggles" could not have occurred prior to 1991 (see Pl. 56.1 ¶¶ 67–71), she now concedes that alterations could have occurred in the 1990's. She also claims to have no knowledge regarding the process used to add the additional words to the title because

---

**9.** The Court notes that it would not have been difficult for Stouffer to determine whether or not the copy of the advertisement she attached to the counterclaims was accurate. Plaintiffs apparently discovered the discrepancy between Stouffer's copy and the original version that ran in *Playthings* by simply visiting the New York City offices of the company that publishes *Playthings.* (See Declaration of Christina B. Keflas ¶ 6).

the additional printing was handled by her company's art department (Memorandum in Opposition to Motion for Sanctions at 9; Def. 56.1 ¶ 63); however, neither Andé nor BCI still existed in 1991, and consequently there was no art department to which Stouffer could have delegated any reprinting responsibilities. And though the evidence may not clearly establish that Stouffer altered the title pages of the booklets for the specific purpose of supporting her claims in this litigation, she clearly knew that the booklets at issue were not created—much less marketed and sold—by Andé in the 1980's. Thus, by attaching a copy of one of the altered booklets as an exhibit to her counterclaims (SAAC Exh. 9), and by relying upon that exhibit to support her patently false allegation that "[b]etween April 1986 and September 1987, Andé aggressively promoted ... *The Legend of RAH and the MUGGLES*" (SAAC ¶ 76), she committed a fraud upon the Court.

## C. *The Altered RAH Screenplay*

It is undisputed that Stouffer attached a screenplay bearing the title "The Legend of RAH the Light and the Muggles" as an exhibit to her counterclaims (SAAC, Exh. 18; see also Section I.B., *supra*), and that she relied on this exhibit to support her claim that she owns trademark rights in the term "Muggles." (SAAC ¶ 92, *passim*). It is also undisputed that the screenplay for which Stouffer obtained copyright registration in 1988 was *not* entitled "The Legend of RAH the Light and the Muggles," and did not contain the word "Muggles" in its title. (See Choe Decl., Exh. 16). Stouffer concedes that the screenplay attached to her pleading is not a true and accurate representation of the screenplay deposited with the Copyright Office. (Memorandum in Opposition to the Motion for Sanctions at 10). However, she maintains that the change in the screenplay's title was made long before

this action was filed and that she inadvertently attached a "working copy" of the screenplay to her counterclaims rather than a copy of the screenplay that was actually registered. (*Id.*). She also points out that the specific allegation in her counterclaims that relates to the screenplay refers to the title as "RAH the Movie" (*Id.;* SAAC ¶ 92); she insists that this fact undermines plaintiffs' assertion that she purposely altered the screenplay in order to create the false impression that she had copyrighted a work with "Muggles" in the title in 1988. Regardless of how or why Stouffer attached the inaccurate copy of the screenplay to her counterclaims, the Court is troubled by her inclusion of yet another inaccurate and misleading exhibit in her pleading. And while such conduct might not by itself constitute clear and convincing evidence of a fraud upon the Court, when considered along with all the other pieces of falsified evidence submitted by Stouffer (see *supra, infra*), it bolsters the Court's finding that Stouffer has engaged in sanctionable misconduct.

## D. *Altered Drawings of Muggles Merchandise*

In her counterclaims, Stouffer supports her assertion of trademark rights in the term "Muggle(s)" by alleging that prior to Andé's bankruptcy in 1987, the company had proposed "licensing concepts [including] character sleepwear bearing the slogan 'HAVE A MUGGLE$_{TM}$ DAY,' a MUGGLE$_{TM}$ character hand-puppet, and character boys' shirts, pants and shoes." (SAAC ¶ 82). Stouffer also attached drawings of those products as an exhibit to her counterclaims (SAAC, Exh. 11). One of those drawings depicts a girl wearing a nightgown that bears the slogan "HAVE A Muggle$_{TM}$ DAY," and in another, in which a boy wears Muggle-related clothing and clutches a Muggle hand-puppet, the word "Muggle$_{TM}$" written across

the top. (*Id.*). However, during discovery plaintiffs' obtained other copies of these drawings from a Pennsylvania law firm involved in Andé's bankruptcy proceeding. (Declaration of Joanna Schmitt ¶¶ 17–18). The copies Stouffer submitted to her bankruptcy counsel are identical to the drawings attached to her counterclaims, except that in the copies obtained from her bankruptcy attorneys the girl in the nightgown does not contain the phrase "HAVE A Muggle$_{TM}$ DAY," nor does the drawing of the boy contain the word "Muggle$_{TM}$." (*Id.* Exh. M). Also, one of Andé's former illustrators has testified that the original versions of these drawings did not include the word "Muggle" or "Muggles." (Declaration of Ann Fitzpatrick ¶¶ 12–13). Thus, it is clear that the drawings were altered after Andé ceased operations. It is also clear that the words which were added to the drawings directly support Stouffer's claim that she used "Muggle" as a trademark in the 1980's.

Stouffer does not contest the inescapable conclusion that the drawings were altered. She claims, however, to have no knowledge regarding the alteration, and asserts that because she continued to market and promote Muggles merchandise after Andé's demise it is "certainly possible" that the drawings were altered long before this litigation arose. (See Memorandum in Opposition to the Motion for Sanctions at 11). However, after Andé filed for bankruptcy, any promotion of merchandise relating to *RAH* or the Muggles would have been done either under the auspices of BCI, which only existed for a period of roughly five months in 1988 (see Def. 56.1 ¶ 123; Pl. 56.1 ¶ 124), or by Stouffer herself, who was the only person working to promote· her properties after BCI closed. And since BCI was an informal operation that employed at the most three people (Stouffer, her mother, and Joan Korbin Wright), it is difficult to believe that the alterations to the drawings, which directly affect Stouffer's supposed trademark rights, could have been made without her knowledge. Therefore, regardless of whether the alterations were made before or after this litigation arose, when Stouffer submitted the altered drawings as evidence of Andé's use of "Muggles" as a trademark in the 1980's, she made a fraudulent misrepresentation to the Court.

E. *Altered Copies of Larry Potter and His Best Friend Lilly*

In her counterclaims, Stouffer asserts that plaintiffs' use of the character "Harry Potter" infringes on her copyrights to "Larry Potter," a character who appears in *Larry Potter and His Best Friend Lilly,* a booklet that Stouffer claims to have published in the 1980's. (SAAC ¶¶ 68, 108 and Exh. 27; Stouffer Deposition 617:24–618:4). However, in the course of this litigation Stouffer has not produced a single booklet entitled *Larry Potter and Her Best Friend Lilly.* Rather, she has produced one "printer's proof" of this booklet that was allegedly created by Andé, and two color photocopies of a booklet purportedly created by BCI in 1988. (Choe Decl., Exh. 25–27; Section I.B., *supra* ). Plaintiffs have produced undisputed evidence indicating that neither the one paragraph in the Andé printer's proof that refers to "Larry Potter," nor the original booklet from which the two color photocopies were made, could have been printed prior to 1993 (Pl. 56 .1 ¶¶ 114–118, 148, 154). In the face of such evidence, Stouffer now claims that the color photocopies were made from a booklet printed in the early 1990's, when Stouffer was allegedly revising *Larry Potter and Her Best Friend Lilly* for future publication. (Memorandum in Opposition to the Motion for Sanctions at 12). However, if the original booklet was created in the early 1990's, then its title page—which contains a copy-

right date of 1988—is patently false, and Stouffer's knowing submission of photocopies containing such a misrepresentation constitutes a fraud on the Court.

## F. *Forged BCI Invoices*

In her counterclaims, Stouffer alleges that her booklets were sold in Acme supermarkets in 1988. In support of that allegation she has attached as exhibits two invoices purporting to be records of sales to Great Northern Distributors. (SAAC ¶ 90, Exh. 16). However, as set forth *supra* (Section II.B.2.), the BCI salesperson and the representative of Great Northern who are listed on the invoices *have both testified that the sales referred to in the invoices never took place.* (See Declaration of Joan Korbin Wright ¶¶ 12–15; Declaration of Randolph Slaff, ¶¶ 33–45; Choe Decl., Exh. 36). Stouffer does not deny that the goods listed in the invoices were never sold to Great Northern, although she now maintains that the invoices "appear to relate primarily to future [sales] periods." (Memorandum in Opposition to the Motion for Sanctions at 14). However, such explanation does not justify submitting the invoices in support of her allegation that she "arranged to sell and did later sell" her properties in 1988. (SAAC ¶ 90). Her counterclaims did not refer to the invoices as being representative of "future" sales that never occurred, and thus her submission of the invoices was clearly misleading.[10]

More importantly, the evidence in the record clearly indicates that the invoices themselves are fraudulent. The representative of Great Northern whose name appears on the invoices has testified that the signature on the invoice is not his. (Slaff Decl. ¶¶ 35–36, 39–40, 43–44). And Joan

Korbin Wright, the BCI salesperson listed on the invoice, has stated under oath that she recognizes the signature on the invoice—which purports to be that of Great Northern's president, Randolph Slaff—to be in Stouffer's handwriting. (Wright Decl. ¶ 15). Stouffer claims that the Slaff signature is in Wright's handwriting, but even if that were true the invoices would still be forgeries—and thus Stouffer would still have knowingly submitted fraudulent documents to the Court. Such conduct is clearly sanctionable.

## G. *The Draft Agreement Between BCI and Warner Publisher Services*

Stouffer has alleged that in 1988 she entered negotiations with Warner Publisher Services (WPS) for the purpose of establishing a distribution agreement between BCI and WPS. (SAAC ¶ 91). Though the two companies never entered into a final agreement, Stouffer attached a draft agreement between BCI and WPS as an exhibit to her counterclaims; such exhibit was attached in support of her claim that plaintiffs had access to her *RAH* booklets in the late 1980's. (*Id.* ¶ 91, Exh. 17). The draft agreement submitted by Stouffer, which is dated October 20, 1988, contains an exhibit listing the five booklets which were to be distributed by WPS, the third of which is *RAH*. (*Id.* Exh. 17). However, on two other copies of that same draft agreement-a copy retained by BCI employee Joan Korbin Wright (Wright Decl. ¶¶ 21–22, Choe Decl., Exh. 38) and a second copy given by Stouffer to the attorney representing her during Andé's bankruptcy (Transcript of Proceedings, May 31, 2001, 11:5–10)—the third title listed in the exhibit is *The Land of the Nother–One*, not *RAH*. And upon close inspection of the

---

10. The Court also notes that Stouffer's recent admission that BCI made only "slight" sales to Great Northern Distributors (Memorandum in Opposition to the Motion for Sanc-

tions at 14) directly contradicts her earlier testimony that "[q]uite a huge amount" of books were shipped to Great Northern. (Stouffer Deposition 505:6–10).

version submitted by Stouffer, it is clear that the word "RAH" is not aligned with the other words on the page. (Choe Decl., Exh. 38). Clearly the word "RAH" was added to the draft agreement exhibit after the document was originally created.

Stouffer recognizes that the version of the draft agreement that she submitted with her counterclaims was altered, although she denies altering the document herself. (Memorandum in Opposition to the Motion for Sanctions at 17). However, given the fact that two parties with no interest in the outcome of this litigation produced unaltered copied of the agreement, whereas Stouffer produced a copy that was altered in a manner that directly supports her claims in this litigation strongly indicates that she is responsible for the alteration.

■ In conclusion, the Court finds, by clear and convincing evidence, that Stouffer has perpetrated a fraud on the Court through her submission of fraudulent documents as well as through her untruthful testimony. Such finding requires that the Court next determine the appropriate sanction to impose. In making that determination, the Court considers five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; (v) whether further misconduct is likely to occur in the future. *See McMunn, supra,* 191 F.Supp.2d at 461.

■ Plaintiffs seek two types of sanctions: the dismissal of Stouffer's counterclaims and the award of plaintiffs' attorneys' fees and costs incurred in this action. In granting plaintiffs' motion for summary judgment the Court has already dismissed Stouffer's claims; thus, the Court need not address the issue of whether dismissal is an appropriate sanction. With respect to plaintiffs' legal fees and costs, the Court finds that an award of such fees and costs is appropriate given the fact that Stouffer has engaged in a pattern of intentional bad faith conduct and failed to correct her fraudulent submissions, even when confronted with evidence undermining the validity of those submissions. It is true that Stouffer is the defendant in this action and thus not *all* of the attorneys' fees and costs incurred by plaintiffs in this action are attributable to Stouffer's fraud on the Court. However, Stouffer's calculated generation of fraudulent documents and testimony undoubtedly imposed burdens on plaintiffs by increasing the legal fees and expenses incurred by plaintiffs in the investigation and defense of her counterclaims. Accordingly, the Court awards a monetary sanction against Stouffer in the amount of $50,000.

In addition, the Court finds that plaintiffs are entitled to a statutory award of attorneys' fees and costs with respect to their defense of Stouffer's trademark claims. Under the Lanham Act, prevailing parties in trademark infringement actions may be awarded attorneys' fees and costs in "exceptional cases." 15 U.S.C. § 1117(a). The Second Circuit has held that fees will only be awarded upon evidence of fraud or bad faith. *See Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 194 (2d Cir.1996) (citations omitted). Here the Court finds that Stouffer has asserted claims and defenses without any reasonable basis in fact or law and has attempted to support such claims and defenses with items of evidence that have been created or altered for purposes of this litigation. This Court has granted plaintiffs' motion for summary judgment with respect to Stouffer's Lanham Act claims and finds that there is clear evidence of Stouffer's fraud and bad faith in the prosecution of such claims. Accordingly, plaintiffs are

awarded their attorneys' fees and costs incurred in defending those claims.

## Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment is granted. Stouffer's counterclaims and crossclaims are dismissed with prejudice. The Court declares that plaintiffs' publication, distribution, and exploitation of the *Harry Potter* books does not violate any of Stouffer's intellectual property rights. Stouffer is permanently enjoined from making false representations to third parties indicating that she owns all rights in the "Muggle" and "Muggles" trademarks and copyrights, or indicating that plaintiffs have violated her intellectual property rights.

Plaintiffs are granted judgment against defendant for their attorneys' fees and costs incurred in defending Stouffer's Lanham Act claims in this action. Plaintiffs are directed to make an application, within 30 days from the entry of this order, detailing the amount of such fees and costs. Further, plaintiffs' motion for sanctions is granted in the amount of $50,000.

The Clerk of the Court is directed to enter judgment in favor of plaintiffs and against defendant and, following the Court's disposition of plaintiffs' fee application, to close the file in this action.

SO ORDERED.