**UNIVERSE ANTIQUES, INC., Plaintiff,**

v.

**William VAREIKA and William Vareika Fine Arts, Ltd., Defendants/Third–Party Plaintiffs,**

v.

**Jack Shaoul, Third–Party Defendant.**

**No. 10 Civ. 3629.**

United States District Court, S.D. New York.

Nov. 10, 2011.

Robert Leslie Greener, Robert L. Greener, Law Office, New York, NY, for Plaintiff.

Joseph E. Czerniawski, Ganfer & Shore, LLP, New York, NY, James D. McGinley, Edwards Angell Palmer & Dodge LLP, Boston, MA, for Third–Party Defendant.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Universe Antiques, Inc. ("Universe") brought this action against defendants William Vareika ("Vareika") and

William Vareika Fine Arts, Ltd. ("WVFA," and together with Vareika, "Vareika Parties"), seeking damages for breach of contract, unjust enrichment, an account stated, tortious interference with contract and fraud. Universe alleges that it consigned to WVFA a painting, which WVFA later sold and for which a balance of $560,000 remains due. The Vareika Parties counter that WVFA withheld the balance due on the painting as a set-off against damages it suffered as a consequence of prior transaction with Universe involving Universe's fraudulent sale of a stained glass window to WVFA. WVFA purchased the window based on Universe's representations that it was an 1896 Tiffany Studios window when, Vareika claims, the window was not, in fact, by Tiffany. The Vareika Parties filed counterclaims against Universe and its sole shareholder and president, third-party defendant Jack Shaoul ("Shaoul"), alleging fraud in the inducement, breach of contract and unjust enrichment. The Court conducted a bench trial on October 24–28 and 31, 2011 to adjudicate Universe's claims and the Vareika Parties' counterclaims.

The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. As explained below, the Court concludes that Universe proved by a preponderance of the evidence that WVFA is liable for breach of contract in the amount of $560,000. The Court further concludes that the Vareika Parties proved by clear and convincing evidence that Universe is liable for fraud in the inducement, as a result of which WVFA suffered damages of $1,227,122. Consequently the Vareika Parties are entitled to judgment in the amount of $1,227,122, reduced by $560,000, its liability to Universe.

## I. FINDINGS OF FACT [1]

### A. THE PAINTING

The first transaction at issue in this case involves an oil painting by William Trost Richards known as "The Rainbow" (the "Painting"). Universe, located in New York City, is a wholesaler of 19th and 20th century works of art, primarily paintings, sculptures, stained glass and other objects d'art. In 2007 Universe consigned the Painting to WVFA, which sells art directly to the public and had identified a potential buyer for the Painting. WVFA accepted the consignment at a price of $700,000 for a sixty-day period. (See Pl. Ex. 40 (consignment agreement executed by Vareika); Tr. 24:8–25:15 (stipulating that same document was also executed by Shaoul).) The parties stipulated that WVFA accepted delivery of the Painting and agreed to pay the consignment price of $700,000. WVFA, in turn, sold the Painting to the actor Nicholas Cage ("Cage") in January of 2008. Cage agreed to pay WVFA for the Painting and other items on a monthly installment plan. The parties stipulated that in January of 2008, WVFA requested, and Universe agreed, to modify the payment term of the consignment agreement from a lump sum payment to ten monthly installments of $70,000. The parties further stipulated that WVFA made the first two payments of $70,000 in February and March of 2008. WVFA stopped making payments on the Painting in April of 2008. Therefore, a balance of $560,000 remains due under the consignment agreement. Meanwhile, Cage filed for bankruptcy and ceased making payments to WVFA. As a result, WVFA took back the Painting in

1. While the Court has reviewed and considered all of the live testimony and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to its factual and legal conclusions.

August of 2008 and ultimately, via a limited liability company formed for this purpose, assumed title to the Painting.

## B. *THE WINDOW*

The larger and more difficult dispute in this litigation concerns the second transaction between the parties: the sale by Universe to WVFA of a stained glass window ("Window") that Universe represented to be the work of Tiffany Studios. The parties hotly contest the authenticity of the Window as a Tiffany. For the reasons listed below, the Court concludes that a preponderance of the evidence admitted into the trial record supports a finding of Vareika's claim that the Window is the work of Joseph Evan MacKay ("MacKay") dating from approximately 1904, not an 1896 Tiffany.

### 1. *Historical Documents*

The strongest single piece of evidence that the Window is by MacKay and not Tiffany is an article that appeared in *Overland Monthly and Out West Magazine* in May of 1904 ("*Overland* Article"). The *Overland* Article, titled "The Evolution of a Window," explores the process of creating a window of opalescent glass. Illustrations accompanying the *Overland* Article include two images of the "same window" at issue in this case. (Tr. 595:19 (Sloan); *see* Sloan Rpt. (Def. Ex. 42) at 73–74.) The first image, which is somewhat difficult to make out, bears the caption, "Paper tracing of a window design, ready to be replaced by glass." (Def. Ex. 40.) That a paper tracing of the Window appeared in the *Overland* Article is "strong evidence" that the Window was in production in 1904 when the *Overland* Article was published. (Tr. 598:8 (Sloan).) The second image is readily recognizable as the Window and bears the caption, "Same design before it has been toned and leaded, for home of

Mrs. Maurice Casey [ ("Mrs. Casey") ]." (Def. Ex. 40.) The text of the article includes the following information: "Mrs. Maurice Casey owns a pastoral poem in glass. Both her window and Mr. Hill's are the work of Joseph Evan MacKay." (*Id.*) The *Overland* Article places the Casey family home in San Francisco, not Tiburon, California. Other trial evidence indicates that Mrs. Casey began construction of a house in 1902 at the San Francisco location referred to in the *Overland* Article, and that MacKay had opened an art studio producing stained glass works in San Francisco sometime around 1902.

Universe's explanation for the *Overland* Article is that MacKay worked for ten years as an artist for Tiffany Studios. As a result, according to Universe, the *Overland* Article's statement that the Window was the work of MacKay is consistent with Universe's attribution of the Window to Tiffany. While the trial evidence contains references to several newspaper reports that identify MacKay as a former employee of Tiffany (*see* Sloan Rpt. at 75–79), census records and other objective evidence place MacKay thousands of miles away from Tiffany's New York studios during the relevant time period around 1896 (*see id.* at 75). Thus, even if MacKay had worked at Tiffany Studios prior to forming his own firm in San Francisco around 1902, documentary evidence places him in California, not New York, by 1904 when the Window was in production for Mrs. Casey's home, which was completed in 1904. The Window would have taken only "[t]hree to six months max[imum]" to produce and therefore most likely dates from 1904, not 1896. (Tr. 628:11 (Sloan).)

### 2. *Christie's 1978 Auction*

The Window next surfaced in the mid-1970s at a Los Gatos, California gallery called Corinthian Studios. In 1978, Leon-

ard Trent ("Trent") consigned the Window to Christie's auction house in New York. Trent told Alastair Duncan ("Duncan"), who was Christie's art nouveau director at the time, that Trent had acquired the Window as a Tiffany in California and that it originated at a home in Tiburon, California. Duncan knew Trent to be a prominent Tiffany dealer, and he incorporated the provenance provided by Trent, without performing any independent verification, into Christie's catalogue in connection with an auction scheduled to be held on December 1, 1978 (the "Christie's 1978 Auction"). The catalogue described the Window, listed as lot 350 ("Lot 350"), as "by Tiffany Studios, New York, 1896." (Def. Ex. 2.)

During the auction preview, however, Duncan received a telephone call from a person who identified himself only as calling from California and who questioned the attribution of the Window to Tiffany. Duncan later received a second anonymous call inquiring whether Christie's had corrected the listing for lot 350. Christie's did not publish a written amendment to the catalogue; however, Duncan testified that the auctioneer made an oral announcement indicating that the Window was no longer being attributed to Tiffany but rather "in the style of" Tiffany or "American School of stained glass." (Tr. 1048:2–7 (Duncan).) The highest bid on the Window at the Christie's 1978 Auction was $9,000, well below the reserve price of $40,000 set by Trent. Because bidding on the Window failed to reach the reserve price, the Window was not sold on that occasion.

Shaoul attended the Christie's 1978 Auction, but his recollection of it differed sharply from Duncan's. Most significantly, Shaoul denied hearing any announcement altering the representation in the catalogue concerning Lot 350. Shaoul testified that he had noticed the Window at the auction preview and "it just knocked [him] on [sic] [his] feet. It was so beautiful." (Tr. 809:1–2.) Shaoul attended the auction "from the beginning to the end" (Tr. 809:19) and purchased approximately a dozen lots. According to Shaoul, he placed bids on the Window just below the minimum of the $35,000 to $45,000 range published in the catalogue, specifically up to "like 34,000, 33,000, and my heart was going, racing like crazy, because I didn't have more money. . . . So I stopped." (Tr. 865:10–12.) Yet, after all of this attention and energy, Shaoul testified: "I have no idea if the window sold [at auction]. . . . I don't know if it sold or somebody bought it. I was talking to many friends over there, 300 people there, and I have no idea what happened, who bought it." (Tr. 812:7–17.) Shaoul's claim that he bid as high as $34,000 is not credible, as it is contradicted by Duncan's contemporaneous notes indicating that the highest bid was $9,000. Even less believable, however, is Shaoul's claim that he "ha[s] no idea if the window sold." Tellingly, when confronted with the incredibility of this claim on cross-examination, Shaoul answered only, "That was the story." (Tr. 865:1.)

### 3. *Sotheby's 1981 Auction*

Although he denies it, the evidence shows that Shaoul next encountered the Window at a February 4–5, 1981 Sotheby's auction (the "Sotheby's 1981 Auction"), where it was listed as lot 305 ("Lot 305") and described as a "LARGE AMERICAN STAINED GLASS WINDOW, 20th century." (Def. Ex. 292.) Accompanying the description of the Window in the Sotheby's 1981 Auction catalogue was a photograph depicting certain streaks, "impossible to duplicate in the manufacturing process," and identical to streaks apparent in the photograph of the Window in the *Overland Article*. (Tr. 616:1–2 (Sloan).)

Sarah Hill ("Hill"), who worked as a cataloguer at Sotheby's from the late 1970s through the late 1980s, testified and produced her original copy of the Sotheby's 1981 Auction catalogue containing her contemporaneous notes from it. As to most items listed in the catalogue, Hill recorded, in what appears to be ink of a blue felt-tipped pen, a number corresponding to the highest bid, a number indicating the paddle of the winning bidder and, below that, identification of the bidder when she knew who they were or when she heard the auctioneer announce the bidder. Scrawled across the description for Lot 305 is the number "11000," which represents the final bid and actual sale price of $11,000 paid for the Window. To the right of "11000," Hill made the following notations: "229" and "Universe." Hill testified that "229" referred to a paddle number and that the location of the word "Universe" indicated that Universe was a buyer as opposed to a consigner. Hill testified that Universe was a regular customer of Sotheby's, and that she was acquainted with Shaoul at that time. Hill was able to identify Shaoul at trial. Hill was not aware of any entity other than Universe Antiques, Inc. to which her notation "Universe" on that catalogue might refer.

Shaoul's account of his acquisition of the Window is unsupported and unconvincing. According to Shaoul, he was "walking on University Place" in January of 1981 when he just coincidentally happened to see the same window he had previously seen in 1978 at Christie's, coincidentally just as it was being unloaded in front of Ace Gallery. (Tr. 817:16.) Shaoul testified that he purchased the Window that same day in exchange for "every piece of furniture [he] had in [his] shop" plus "a bunch of cash." (Tr. 819:20–24.) Thus, according to Shaoul, he acquired the Window in January of 1981, which would have been within the month prior to the Sotheby's 1981 Auction on February 4–5, 1981 at which the Window was sold. Shaoul does not explain this glaring and major timing discrepancy, which throws into question the accuracy and credibility of his account. This testimony is also questionable in another respect. Shaoul was unable to quantify the price he paid or to produce any documentary evidence of this sale by Ace Gallery on a work he claims is an original 1896 Tiffany and on which he later placed a value of $2 million. The Court finds this explanation to be about as plausible as Shaoul's suggestion that he got the Window "[f]rom the moon." (Tr. 879:22.)

By contrast, the Court finds Hill's testimony regarding the Sotheby's 1981 Auction to be credible and reliable. Hill has no stake in this litigation and appeared at trial pursuant to a subpoena. Shaoul's claim that he did not attend the Sotheby's 1981 Auction is incredible in light of Hill's testimony and contemporaneous notes, which indicate that Universe was the buyer of Lot 305.

### 4. Shaoul's Ownership of the Window

When Shaoul acquired the Window in 1981, Universe was located at 832 Broadway, which is across the street from Universe's present location at 833 Broadway. Shaoul displayed the Window in his loft apartment above the shop at 832 Broadway. Several witnesses testified to having seen the Window in Shaoul's home in the mid–1980s when it was displayed in a light box above Shaoul's dining room table. (See, e.g., Tr. 383:4–284:13 (Michaan); id. at 445:10–17 (Angelucci); id. at 979:4–7 (Purcell).) Tiffany collector Allen Michaan ("Michaan") testified that, during the time the Window was displayed in Shaoul's loft, he and Shaoul maintained a close professional and personal relationship, that he had seen the Window in the loft on numerous visits, and that he had discussed it

often with Shaoul. He told Shaoul at that time that he did not believe the Window was a Tiffany and testified that Shaoul, through various words, expressions and demeanor, acknowledged to Michaan that the Window was not a Tiffany. In particular, Michaan testified that "Shaoul would love to say, oh, it's Tiffany, it's Tiffany, and he would often back down from that position." (Tr. 421:23–25.) Shaoul, for his part, insisted at trial that Michaan "never told [him] that [the Window was not a Tiffany. Michaan] loved that window." (Tr. 895:15.) In resolving these conflicting statements, the Court credits the testimony of Michaan. Edward Purcell ("Purcell"), who worked for Universe in the 1980s, testified that Shaoul said of the Window at that time, "It's an old window; it's not a Tiffany." (Tr. 980:11.)

In 1991, Shaoul sold the Window to Mayfair Gallery, a dealer in England who re-sold the Window to a gallery in Japan. The following year, in 1992, the Window returned to the United States en route to Shaoul. At that time, Shaoul was under investigation by the Federal Bureau of Investigation ("FBI"). The FBI seized the Window, along with other art objects believed to be misattributed, at John F. Kennedy Airport. The FBI impounded the window from 1992 to 1996, when it was returned to Universe. The Window remained at Universe's shop, now located at 833 Broadway, until approximately 2006, when it travelled to Dubai as part of an antiques exhibition. The Window failed to sell abroad and returned to the United States in 2007, having sustained some damage from the journey to Dubai and back.

5. *WVFA's Purchase of the Window for the Minnesota Marine Art Museum*

In early 2007, Vareika indicated to Shaoul that WVFA had a major client who

was interested in acquiring art and that Shaoul should send Vareika proposals of suitable objects. Specifically, Vareika's largest clients at the time, Robert Kierlin and his wife Mary Burrichter (together, "the Kierlins"), were interested in acquiring art depicting water. They sought such works for their personal collection or for the Minnesota Marine Art Museum ("the Museum"), of which the Kierlins were major patrons. On January 29, 2007, Shaoul sent an e-mail to Vareika offering for sale two stained glass windows depicting water. Shaoul wrote:

> These two windows went on a journey from here to Dubai and back. During their return they suffered some damages. If your client likes it, let me know because they are going to be repaired by someone very good and experienced with this type of work.

> If your customer likes it I will give a reduced price after the repair.

> The three panel one was 2 million dollars, including frames and the bronzes.

> Tiffany

> 93 × 90″

(Def. Ex. 2.) The e-mail included as attachments photographs, apparently taken by Shaoul, of both windows and documentation of provenance for the first window, which Shaoul had described in the e-mail as "Tiffany." The provenance consisted of three pages from the Christie's 1978 Auction catalogue: the cover page of the auction catalogue, the interior page on which the listing for Lot 350 appeared, and the interior page on which a color image of Lot 350 appeared. The Christie's listing for Lot 350 read in full:

**A UNIQUE AND VERY FINE STAINED GLASS WINDOW**

*by Tiffany Studios, New York, 1896*

Of square form, depicting a view through a deeply wooded glade in Tiburon across the San Francisco Bay to the distant headland, to the front a beige rivulet with flowering pink waterlilies amongst green lily pads, on its banks red bell flowers beneath steep banks, the tall trees with bright multi-colored green leaves against a pale blue sky–93 *in.* × 90 *in.* (235 *cm.* × 228.5 *cm.*), *several sections overlaid to the back*

The window was commissioned for a house in Tiburon in 1896. In the 1930s it was removed pending the remodeling of the house. The latter, however, subsequently burnt down and the window remained in storage until the late 1960s when it was purchased by a studio in Marin County

(Def. Ex. 2.) The color image of Lot 350 appeared to be the same window depicted in the photographs provided to Vareika. Vareika testified that Christie's is "perhaps the largest and most prestigious auction house in the world" and that he considered a provenance by Christie's to be the "gold standard in the art world." (Tr. 83:10–12.)

Vareika approached the Kierlins about acquiring the Window either for the Kierlins' personal collection or for the Museum. The Kierlins almost immediately expressed interest in acquiring the Window for the Museum and requested additional information regarding its dimensions and other details. On May 23, 2007, the Kierlins informed Vareika that the Museum had formally approved the proposal to acquire the Window at a price of $1.3 million, using funds donated by the Kierlins. Vareika then informed Shaoul that he had a buyer for the Window and committed to purchasing the window from Universe at a price of $950,000.

Shaoul provided Vareika with a bill of sale, dated June 29, 2007, which described the Window as:

Stained Glass Window "Tiffany Studios, New York 1896"
93″ × 90″
View trough [sic] a deeply wooded glade in Tiburon, across the San Francisco bay

(Def. Ex. 6.) The bill of sale reflected a purchase price of $950,000 and a required deposit of $95,000. Vareika paid the deposit of $95,000 to secure the Window while it underwent restoration by Steven Stelz ("Stelz"), an art restorer in New Jersey.

Immediately after receiving WVFA's $95,000 deposit on the Window, Universe sent the Window to Stelz to repair the damage to it. Some minor restorations had been done to the Window prior to the restoration by Stelz. When Stelz received the Window, the most obvious damage was a crack in the large glass panel depicting the sky. In addition, perhaps fifty smaller glass panels had sustained cracking or other damage. Stelz informed Shaoul that he did not have the capacity to recreate a large enough panel to replace the sky panel and that consequently he would have to place a custom order at a facility in Pennsylvania. Shaoul rejected Stelz's proposal as too time-consuming and suggested, instead, that Stelz replace the single panel with several smaller pieces of glass that were more readily available. Stelz agreed to do the restoration as Shaoul had requested, and he replaced the single sky panel with three smaller panels. That change required adding so-called lead lines, the dark lines between individual panels of glass. To soften the appearance of the lead lines, Stelz added a three-leaf cluster on one of the tree branches. The combined effect of these changes was to alter the original composition of the artist

who designed the Window. Stelz testified that, had he believed the Window was by Tiffany, he would have refused the commission because he would "not add[ ] elements to such an important window." (Tr. 1014:13.)

After the restoration was complete, Shaoul provided Vareika with a second bill of sale, dated August 28, 2007, which reflected a balance due of $855,000 but was otherwise identical to the original bill of sale. (Def. Ex. 7.) Both bills included a provision that

> The buyer can return the window to Universe Antiques, Inc for full refund witting [sic] 60 days after the date of the sale. Buyer is responsible for all shipping, handling and insurance fees related to this transaction.

(Def. Ex. 6, 7.) Vareika paid the balance to Universe and arranged to have the Window transported to the Museum. The Museum announced its acquisition of the Window in a press release and held a festive unveiling ceremony on February 28, 2008.

### 6. Questions Surface Regarding the Attribution of the Window

Less than one month after the unveiling, the Museum's curator and executive director received an unsigned letter questioning the representation of the Window as the work of Tiffany. Specifically, the anonymous author wrote in relevant part:

> I am sorry to inform you that your window is most certainly NOT the product of Tiffany Studios. This window has been around in the marketplace since the late 1970s and has been misrepresented before. It was originally consigned to Christies [sic] in the late 70s as a Tiffany window but was removed from the sale by the auction house when a number of experts came forward to advise them that it was not a Tiffany window. It was subsequently consigned

to Sothebys [sic] as a "LARGE AMERICAN STAINED GLASS WINDOW", which it is, and sold in their sale of Feb. 4, 1981 for $11,000 as lot # 305. A copy of that auction catalog's pertinent pages is enclosed. The current value of this window at auction today is, in my estimation, $40,000 to $60,000.

(Def. Ex. 204.) At trial, Michaan admitted for the first time that he was the author of the unsigned letter to the Museum.

On March 13, 2008, the Museum forwarded the unsigned letter, including the attached pages from the Sotheby's 1981 Auction, to Vareika along with a request for provenance and additional information regarding the history of the Window. The following day, Vareika forwarded to Shaoul the letter and the relevant pages from the Sotheby's catalogue. Shaoul responded by reiterating that the Window was a Tiffany.

During March and April of 2008, Vareika made repeated requests of Shaoul for information regarding the provenance of the Window, including when and where Universe had acquired it. In that connection, Shaoul provided Vareika with eight letters written by individuals who were familiar with Tiffany glass and who purported to authenticate the Window. Shaoul also hired a researcher, Michelle Safer, to investigate the provenance of the Window. However, Shaoul never revealed to Vareika when and where Universe acquired the Window or the acquisition price. Nor did Shaoul disclose that the Window had been impounded by the FBI from 1992 to 1996 in connection with an investigation involving Shaoul and related to the sale of misattributed art works.

With the authenticity of the Window as a Tiffany still unresolved, in April of 2008, Vareika proposed that Shaoul place the purchase funds from the Window into an escrow account until the matter was settled. Vareika also informed Shaoul that

WVFA would suspend installment payments for the Painting as a set-off against damages potentially owed to WVFA by Universe relating to the Window. Shaoul did not agree to establish an escrow account or that payments on the Painting should be suspended, although he did offer to take back the Window in exchange for a full refund to WVFA.

Growing doubtful that the Window was the work of the Tiffany Studios, Vareika sought assistance from Julie Sloan ("Sloan"), an independent consultant in stained glass. On April 15, 2008, Sloan sent Vareika photographs that led him to believe that the Window was not a Tiffany. Sloan informed Vareika that the Window was likely the work of a lesser-known artist, MacKay. By that time, Vareika had confirmed certain details set forth in the unsigned letter, namely, that the Window did not sell at the Christie's 1978 Auction and that it later sold for $11,000 as an unattributed American window at the Sotheby's 1981 Auction. Vareika had sought and received the opinions of several independent Tiffany experts who believed that the Window was not the work of Tiffany Studios; in contrast, the opinion letters provided by Shaoul were from close friends and business associates of Shaoul. Shaoul continued to maintain that the Window was an authentic Tiffany and to offer far-fetched explanations for any contrary information that Vareika presented to him. Communications between Vareika and Shaoul regarding the provenance and authenticity of the Window continued through the summer of 2008.

### 7. *Damages to WVFA*

On May 26, 2010, Vareika informed the Kierlins that he believed that the Window was not the work of Tiffany Studios. Vareika engaged Sloan to inspect the Window at the Museum, which she did on June 7, 2010, at a cost to Vareika of approximately $15,000. After inspecting the Window in person, Sloan prepared a detailed report in which she reiterated her opinion that the Window was not by Tiffany and was instead by MacKay. The Museum decided that it would keep the Window but to attribute it to MacKay and to set a valuation on it of $100,000. Vareika agreed to finance the re-printing of the Museum's catalogue to reflect the new attribution of the Window, and he did so at a cost of $11,015. Vareika also agreed to give the Museum $1.2 million in WVFA gallery credit, reflecting the difference between the purchase price of $1.3 million paid by the Museum and the valuation of the Window as the work of MacKay. Subsequently the Museum selected two paintings, valued at $900,000 and $45,000, from WVFA for its collection. The former work, valued at $900,000, was the Painting, of which WVFA had taken possession following Cage's bankruptcy. Vareika deducted the value of the two paintings from the credit he had extended to the Museum and paid $1,107 in shipping costs. The Museum still holds a WVFA gallery credit of $255,000.

Vareika testified that prior to the Museum's receipt of the unsigned letter questioning the authenticity of the Window as a Tiffany in March of 2008, the Kierlins had purchased approximately $35 million of artwork from WVFA over twenty-six months. During trial, Vareika "guesstimat[ed]" that $10 million of that amount represented profit to WVFA. (Tr. 369:15.) WVFA has not made any sales to the Kierlins since March of 2008.

### 8. *Expert Opinions*

The Court admitted into the trial record as evidence the opinions of three experts concerning the authenticity of the Window.

The Vareika Parties offered the expert opinion of Sloan that the Window is not the work of Tiffany Studios but rather of MacKay. The Court concludes that Sloan's testimony was credible, her report detailed and her expert opinion reliable and thus entitled to substantial weight. Sloan holds a bachelor's degree in medieval art history from New York University and a master's degree in historic preservation from Columbia University. She is now a consultant in stained glass, with nearly thirty years' experience in the field, who had no prior record of doing business with the parties to this litigation.

Sloan personally examined the Window on June 7, 2010, while it was installed in a light box at the Museum. Using a scissors lift, Sloan was able to examine closely both the front and the reverse side of the Window. Based upon objective evidence, such as the *Overland* Article and other historical documents she uncovered pertaining to the works of MacKay, as well as her own subjective impressions of the Window's artistry, materials, and construction techniques, Sloan concluded that the Window "bears no resemblance to those created by Tiffany Studios, except on the most superficial level." (Sloan Rpt. at 2.) In particular, Sloan noted differences in the materials and techniques used to construct the Window, as compared to windows created by Tiffany Studios, with respect to the presence or absence of copper foil, Y-profile lead came and acid-etching, among other distinctions. Sloan also noted differences in the complexity of plating, or layering of glass, the complexity of glass cutting and the quality and type of glass used in the creation of the Window. Finally, Sloan observed differences in the artistry, treatment of distance and depth, and depiction of water and mountains displayed in the Window as compared to known Tiffany windows. Sloan presented these findings and others in a professional, cogent, thorough and convincing 102–page report containing numerous illustrative examples and ample documentary support.

By contrast, Universe submitted the comparatively thin opinions of Joseph Porcelli ("Porcelli") and Michael Wolf ("Wolf"). The Court is not persuaded that Porcelli's opinion, which consists primarily of an attempt to discredit the Sloan report, is entitled to any weight. The majority of the eleven-page document consists of generalizations about Tiffany Studios rather than analysis and opinions specific to the Window. Perhaps that is because Porcelli lacks sufficient familiarity with the Window to give a reliable expert opinion as to its authenticity. As of the date of trial in 2011, Porcelli had not seen the Window since 2007, when it was in Universe's shop at 833 Broadway. Although Porcelli saw the Window at Universe on several occasions prior to 2007, he never examined it for the particular purpose of determining whether it is the work of the Tiffany Studios, nor specifically in the context of an adversarial proceeding. He simply recounted what he recalled about the Window from having seen it about four years ago, his view possibly embodying any representation Shaoul may have made at the time about the Window as the work of Tiffany, as well as any possible effect of Porcelli's business relationship with Shaoul. Moreover, on the occasions when Porcelli viewed the Window, it was under "limited activation," or low lighting. (Tr. 762:10–12.)

Perhaps most significantly, nowhere in his report does Porcelli account for the *Overland* Article's description of the Window as the work of MacKay in 1904. When questioned about the *Overland* Article at trial, Porcelli suggested that the photograph accompanying the article could depict a window other than the Window at issue here. In support of his position,

Porcelli pointed to the presence of additional lead lines and a three-leaf cluster in the Window that do not appear in the 1904 photograph. However, as discussed above, those details were added at Shaoul's instruction when the Window was restored in 2007. Thus, Porcelli's basis for dismissing the *Overland* Article betrayed his lack of firsthand knowledge about the Window, and actually accords with Sloan's explanation.

Similarly, the Court finds that the opinion of Wolf is entitled to no weight. Wolf's report consists of two pages, of which one-half page contains a block quote from a book about Tiffany windows. Wolf testified that he had not seen the Window since the 2004–2005 time frame when it was at Universe, and that he had not inspected it closely since several years prior to 2005. Like Porcelli, Wolf has never examined the Window for the purpose of determining its authenticity, nor in the context of litigation concerning that issue. Moreover, on cross-examination Wolf revealed that the bases for his knowledge and professional opinion about the Window were as sparse as his report was lean on details. In addition to admitting that he had not seen the Window since 2005, he acknowledged that he had merely "scanned" the *Overland* Article (Tr. 510:10); that he was "confounded by the[ ] figures" illustrating the Window in the *Overland* Article (Tr. 513:23); that he "didn't pay that much attention to" the report Safer had provided to Shaoul on her research regarding the Christie's 1978 Auction (Tr. 525:8); that he would be "guessing" as to whether he learned of the failure of the Window to sell at the Christie's 1978 Auction before or after he prepared his report (Tr. 524:17); that he did not remember seeing a document from Duncan to Shaoul in which Duncan stated his view that the Window was not a Tiffany; that he did not remember whether the information about the

Window in the Sotheby's 1981 Auction catalogue was provided to him; that he could not recall if he knew about the FBI's seizure of the Window from 1992 to 1996; and that in general he did not pay attention to everything sent to him.

Finally, the Court takes into consideration that Universe's "experts" are biased: Both Porcelli and Wolf testified that they do or over several years have done business with Shaoul.

## II. CONCLUSIONS OF LAW

### A. THE PAINTING

#### 1. Breach of Contract

■ Under New York law, to recover on its claim for breach of contract Universe must prove: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir.2000) (internal quotation marks omitted); *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 330–31 (S.D.N.Y.2010). Here, WVFA does not dispute that (1) the parties entered into a contract, namely, the July of 2007 consignment agreement for the Painting; (2) Universe delivered the painting; and (3) WVFA made only partial payment under the consignment agreement. Consequently all that remains to be decided is the question of damages. The Court concludes that WVFA's breach resulted in damages to Universe of $560,000, the balance due under the consignment agreement. The Court further concludes that Universe is entitled to interest at the statutory rate of nine percent. *See* N.Y. C.P.L.R. §§ 5001, 5004. However, as discussed below, any damages to Universe are subject to set-off by damages due to WVFA in connection with Universe's sale of the Window to WVFA.

## 2. Other Claims

■ Because the relief sought by Universe on its claim for unjust enrichment against WVFA is identical to the relief it seeks under its breach of contract claim, Universe's unjust enrichment claim is dismissed. *See VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F.Supp.2d 334, 345 (S.D.N.Y.2008); *see also Biosafe–One, Inc. v. Hawks*, 639 F.Supp.2d 358, 369 (S.D.N.Y.2009) (noting that New York law precludes recovery for unjust enrichment where claim arises out of written contract).

■ The Court also dismisses Universe's claims for an account stated and tortious interference with contract because Universe failed to prove by a preponderance of the evidence certain required elements of those claims. In particular, the Court finds that Universe did not establish its entitlement to recover under an account stated claim because it did not prove that WVFA accepted Universe's statement of the account as correct. *See IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F.Supp.2d 395, 411 (S.D.N.Y.2009). As to the tortious interference claim, Universe did not offer any proof of interference with the consignment agreement by a third party. *See Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001).

In addition, Universe failed to establish its entitlement to damages for common law fraud because Universe did not prove by clear and convincing evidence that WVFA knowingly or recklessly misrepresented a material fact. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir.2007). Universe's theory at trial was that WVFA misrepresented Cage's financial position in order to induce Universe to agree to modified payment terms for the Painting that WVFA had no intention of satisfying. Because Universe presented no credible or convincing support in the trial record for this theory, the Court rejects it.

■ Finally, Universe moved at trial pursuant to Federal Rule of Civil Procedure 15(b) to amend its complaint to assert a claim for conversion. Because a conversion claim would be duplicative of Universe's breach of contract claim, *see Biosafe–One*, 639 F.Supp.2d at 368, Universe's motion to amend is DENIED.

## B. THE WINDOW

### 1. Fraud in the Inducement

■ To recover on a claim for fraudulent inducement under New York law, the Vareika Parties must prove by clear and convincing evidence that: "(i) the defendant made a material misrepresentation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance." *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F.Supp.2d 514, 528 (S.D.N.Y.2001); *Allstate Ins. Co. v. Rozenberg*, 590 F.Supp.2d 384, 394 (E.D.N.Y.2008).

■ First, the Court has already concluded that the trial record supports a reasonable finding that the Window was produced by MacKay in 1904 and, consequently, that it cannot be an 1896 work by Tiffany Studios. Therefore, Universe's statements in the January 27, 2007 e-mail and the June 29 and August 28, 2007 bills of sale representing that the Window was an 1896 Tiffany Studios window were false. That falsity was material because the attribution of the Window to Tiffany increased its value by over $1 million.

Second, the Court finds ample evidence from which to conclude that Shaoul knew or should have known that the Window was not by Tiffany. Shaoul's first encoun-

ter with the Window was at the Christie's 1978 Auction, where an announcement was made indicating that the Window could no longer be represented as the work of the Tiffany Studios and was only "in the style of" Tiffany. The Court finds Shaoul's position that he did not hear any such announcement not credible in the light of several other circumstances: Shaoul's testimony on this point is discredited by his claim that he was so enamored of the Window that his heart was racing during the auction, during which he claims he made a bid of between $33,000 and $34,000, while, according to Duncan, the highest bid entered was only $9,000. Even if Shaoul somehow did not hear the announcement, and subsequently did not notice that the Window failed to sell, he would have observed that it was still for sale when he returned to Christie's four days later on December 5, 1978, for the post-auction sale. At the very least, these circumstances would have put Shaoul on notice that questions had been raised about the authenticity of the Window as a Tiffany.

Still stronger evidence that Shaoul knew that the Window was not by Tiffany is his presence at the Sotheby's 1981 Auction at which the Window was sold as an unattributed American stained glass window. Although Shaoul denies attending that auction, the Court credits Hill's testimony and contemporaneous notes, which establish convincingly not only that Shaoul was at the auction, but that he actually purchased the Window on that occasion for $11,000. While Universe has suggested that Sotheby's Lot 305 could have been a copy of the Window, the Court accepts Sloan's testimony that the window pictured in the Sotheby's catalogue as Lot 305 contains certain streaks that are identical to streaks apparent in the Window and would be impossible to duplicate in the manufacturing process. The Court therefore rejects Universe's theory that Lot 305 was a copy of the Window.

Additional evidence that Shaoul knew that the Window was not by Tiffany comes from the testimony of Michaan and Purcell, both of whom testified that Shaoul admitted in the mid–1980s that the Window was not, in Shaoul's opinion, by Tiffany Studios. Finally, Shaoul's instructions to Stelz regarding the restoration of the Window are some indication that Shaoul did not believe that the Window was by Tiffany at the time he sold it to WVFA. It is unlikely that Shaoul would have compromised the value of a genuine Tiffany by commissioning a restoration that materially and prominently altered the original design and composition of the Window, no more so than any owner or respectable art restorer would authorize coloring mascara on the Mona Lisa to cover paint chipping around the eyes. Under these circumstances, the Court concludes that Shaoul knew that the Window was not by Tiffany and intended to mislead WVFA regarding its provenance.

In addition to the clear and convincing evidence of scienter described above, the Court notes that Shaoul's utter lack of credibility defeats any suggestion that his representation of the Window as a work of Tiffany was an honest mistake. The Court has observed Shaoul's demeanor, as well as the content of his testimony under oath, and concludes that Shaoul demonstrated numerous instances, at least one by his own admission, in which he failed to tell the truth, both in and out of court. At trial, he admitted to having lied in a 2005 e-mail to Vareika (Tr. 19:15–20) and in his sworn affidavit to this Court submitted in support of his motion to dismiss (Tr. 859:8–860:10). Beyond these admitted lies, the testimony of third-party witnesses established that Shaoul repeatedly told half-truths, or misleadingly omitted infor-

mation from his own agents and experts, in order to obtain opinions that the Window was an authentic Tiffany. In evaluating Shaoul's credibility the Court has also considered Shaoul's 1993 convictions for eleven counts of mail and wire fraud in connection with making false statements, including statements misattributing a painting to a prominent artist. Additionally, Shaoul received a sentencing enhancement upon the district court's finding that he committed perjury and attempted to suborn perjury during his criminal trial.

▆ Third, the Court finds that WVFA reasonably relied upon Universe's representations of the Window as a Tiffany based upon the 1978 Christie's catalogue provided to Vareika by Shaoul. Vareika testified that the Christie's catalogue, which stated that the Window was the work of Tiffany, is the "gold standard" when it comes to provenance. Universe insists, however, that WVFA had a duty to go beyond the representations by Shaoul and to do independent research, which would have revealed that the Window did not sell at Christie's. While it is true that "a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it," *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 733 N.Y.S.2d 385, 386 (1st Dep't 2001), the Court is not persuaded that WVFA is the kind of sophisticated business entity for which that rule was developed. *See, e.g., id.* (investment fund as plaintiff); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984) (Fortune 500 company as plaintiff). In any event, the sophisticated businessman rule does not alter the general rule that, "[i]n assessing the reasonableness of plaintiff's alleged reliance,

[the Court] consider[s] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F.Supp.2d 155, 180–81 (S.D.N.Y.2009) (internal quotation marks omitted). In other words, the inquiry is "fact-specific." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F.Supp.2d 435, 459 (S.D.N.Y.2007). Here, Vareika's reliance on the "gold standard"—the Christie's catalogue—was reasonable in light of the entire circumstances relating to the transaction, including the history of transactions between the parties and trial evidence, acknowledged by Shaoul himself, that in the context of public auctions of works of art is not customary for ordinary buyers to perform independent research on provenance and authenticity prior to bidding, and instead to rely on the representations of respectable auctioneers such as Christie's and Sotheby's.

Fourth, the Court finds that WVFA suffered damages in the amount of $1,227,122 as a result of its reliance on Shaoul's misrepresentations. That figure is the sum of (1) $15,000 to hire Sloan; (2) $11,015 to reprint the Museum catalogue; (3) $1.2 million in gallery credit; and (4) $1,107 in shipping costs. Pre-judgment interest at the statutory rate of nine percent is mandatory under New York law. *See Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008).

▆ The Vareika Parties also seek consequential damages of $3 million stemming from sales to the Kierlins that they contend would have been realized if not for Universe's fraud. While future profits may sometimes be realized as damages in a fraud case if they are quantifiable, *see Kwon v. Yun*, No. 05 Civ. 1142, 2006 WL 416375, at *11 & nn. 13–14 (S.D.N.Y. Feb.

21, 2006) (collecting cases), such damages typically are barred by New York's out-of-pocket rule. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373–74 (1996) ("Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud."). Here, Vareika testified that any assessment of lost profits at best would be a "guesstimat[e]" and that the Kierlins had no obligation to continue to buy from WVFA. Under these circumstances, the Court finds that any award of damages for lost profits would be too speculative. The Court therefore declines to award them.

Finally, the Vareika Parties seek costs, attorneys' fees, and punitive damages in connection with their fraud claim. The Court concludes that the Vareika Parties have not established circumstances in connection with their fraud claim that would warrant disturbing the settled rule that each party pays its own fees and costs. *See DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F.Supp.2d 627, 664 (S.D.N.Y.2011). In addition, under New York law, where a fraud claim arises out of a contract between the parties, punitive damages are available only where the fraud "was aimed at the public generally" or rose to the level of "evil." *Courchesne Larose, Ltee. v. Ven–Co Produce, Inc.*, No. 10 Civ. 3123, 2010 WL 4877828, at *2 (S.D.N.Y. Nov. 30, 2010) (internal quotation marks omitted). Universe's conduct, though reprehensible, does not meet that high threshold.

### 2. *Other Claims*

The Vareika Parties also seek damages for breach of contract flowing from an alleged agreement between the parties to suspend payments on the Painting while the attribution of the Window was at issue. The Court finds that the Vareika Parties have not established by a preponderance of the evidence that there was a "meeting of the minds" on this issue. *See Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F.Supp.2d 329, 337 (S.D.N.Y. 2006). Consequently the Court cannot find the existence of a contract. *See id.*

At trial, the Vareika Parties moved pursuant to Federal Rule of Civil Procedure 15(b) to amend their third-party complaint to assert statutory claims for breach of warranty. However, as the Vareika Parties pointed out, such an amendment would be necessary only if the Court concluded that the Vareika Parties failed to prove scienter. Because the Court has already concluded that Shaoul acted knowingly and intentionally in misrepresenting the Window to WVFA, the Vareika Parties' motion to amend is DENIED as moot.

### III. *FRAUD ON THE COURT*

After the conclusion of the trial, the Court indicated that it would consider sanctions for two admitted misrepresentations Shaoul made in an affidavit ("Affidavit") he submitted in support of his motion to dismiss the third-party complaint of the Vareika Parties. (*See* Docket No. 14 ¶¶ 31, 40.) Specifically, the Court noted that Shaoul stated in paragraph 31 of the Affidavit that he had never been provided a copy of the unsigned letter when, in fact, he admitted at trial that paragraph 31 was untrue. (Tr. 859:8–860:10.) The Court also noted that in paragraph 40 of the Affidavit Shaoul implies that Duncan had given him an expert opinion acknowledging the authenticity of the Window as a Tiffany when, in fact, Duncan testified at trial that he gave no such opinion. At a minimum, Shaoul's statement on this point is misleading. The Court gave the parties an opportunity to respond to its suggestion that sanctions could be warranted by these false or misleading representations.

■ "In order for the Court to grant sanctions based upon such a fraud, it must be established by clear and convincing evidence that [Shaoul] has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action." *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 439 (S.D.N.Y.2002) (internal quotation marks omitted), *aff'd,* 81 Fed.Appx. 396 (2d Cir.2003). "The essence of fraud on the court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F.Supp.2d 378, 393 (S.D.N.Y.2010).

■ There is ample evidence that Shaoul lied to the Court and to the Vareika Parties intentionally and repeatedly. In particular, the Court finds by clear and convincing evidence that, in these proceedings, Shaoul has made numerous statements under oath or penalty of perjury that were knowingly false when made, including the statements in paragraphs 31 and 40 of the Affidavit described above. Even more troubling was Shaoul's submission after trial of a second affidavit ("Second Affidavit"), in which he attempted to explain away his earlier misrepresentations as "an oversight and mistake." (Docket No. 75 ¶ 8.) In the Second Affidavit, Shaoul claims that he did not recall that he had been provided a copy of the unsigned letter because, upon receiving it, he gave it to Safer and "did not keep a copy of the letter." (*Id.* ¶ 3.) Yet, if that were the case, Shaoul could have asked Safer for the letter instead of demanding it from Vareika's attorneys. Nor does Shaoul explain how "the only copy [he] had went out of [his] possession to Ms. Safer" when the letter was provided to him by e-mail. For these reasons, the Second Affidavit is not a credible reply to the Court's

concerns and, in fact, it confirms and compounds the falsity of Shaoul's previous statements. The ongoing submission of false statements constitutes fraud on the court because it seriously impedes the truth-finding process. Considered in conjunction with Shaoul's admission that he previously lied in an e-mail to Vareika (Tr. 19:15–20), his 1993 fraud convictions for making false statements and the related finding that he obstructed justice by committing perjury and attempting to suborn perjury, the Court finds sufficient evidence that Shaoul repeatedly and intentionally made false statements in this litigation, prior to, during and after the trial, "about issues that are central to the fact-finding process." *Passlogix,* 708 F.Supp.2d at 393. His conduct thus constitutes fraud upon the Court and warrants imposition of appropriate sanctions.

The Vareika Parties seek as sanctions an award of attorneys' fees in connection with opposing Universe's motion to dismiss the third-party complaint. The Court agrees that an award of such fees is appropriate given that Shaoul lied repeatedly about issues central to this litigation, not only failing to correct his fraudulent Affidavit but submitting additional false statements under oath. *See Scholastic,* 221 F.Supp.2d at 444. Accordingly, the Court awards a monetary sanction against Shaoul.

## IV. ORDER

For the reasons stated above, it is hereby

**A. ORDERED** that defendants William Vareika Fine Arts, Ltd. and William Vareika (together, "Vareika Parties") are liable to plaintiff Universe Antiques, Inc. ("Universe") in the following amounts plus interest at the rate of nine percent per year from the date each payment was due until the date of payment as follows:

(1) $70,000 from April 1, 2008;

(2) $70,000 from May 1, 2008;

(3) $70,000 from June 1, 2008;

(4) $70,000 from July 1, 2008;

(5) $70,000 from August 1, 2008;

(6) $70,000 from September 1, 2008;

(7) $70,000 from October 1, 2008;

(8) $70,000 from November 1, 2008; and it is further

**B. ORDERED** that Universe is liable to the Vareika Parties in the following amounts plus interest at the rate of nine percent per year from the date damages were incurred until the date of payment as follows:

(1) $15,000 from June 7, 2010;

(2) $1,200,000 from September 7, 2010;

(3) $11,015 from November 29, 2010;

(4) $1,107 from December 22, 2010; and it is further

**C. ORDERED** that judgment shall be entered in favor of the Vareika Parties against Universe in the amount described in paragraph B minus the amount described in paragraph A above; and it is further

**D. ORDERED** that the motion at trial to amend the pleadings pursuant to Federal Rule of Civil Procedure 15(b) of Universe is **DENIED;** and it is further

**E. ORDERED** that the motion at trial to amend the pleadings pursuant to Federal Rule of Civil Procedure 15(b) of the Vareika Parties is **DENIED;** and it is finally

**F. ORDERED** that the Vareika Parties' request for attorneys' fees in connection with opposing Universe's motion to dismiss the third-party complaint is **GRANTED.** The Vareika Parties are directed to submit a schedule detailing the reasonable attorneys' fees within fourteen (14) days of the date of this Decision and Order.

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**